[No. A122412. First Dist., Div. Four. Feb. 11, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
FAUSTINO AYALA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.B and III.C.

Counsel

Ozro William Childs, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SEPULVEDA, J.**—Defendant Faustino Ayala is a member of the Sureños criminal street gang and was convicted of second degree murder for his participation in the shooting death of a young man who had once associated with the rival Norteños gang. Defendant drove a vehicle filled with gang members, and one of those members fired the fatal shot. On appeal, defendant contends that (1) the evidence is insufficient to support his murder conviction under the natural and probable consequences doctrine; (2) the court erred in discharging a juror for misconduct and substituting an alternate juror during deliberations (Pen. Code, § 1089); and (3) a gang-related firearm enhancement must be stricken because the jury failed to find that defendant was a principal in the murder (Pen. Code, § 12022.53, subd. (e)(1)). We reject the contentions and affirm the judgment.

In the published part of this opinion, we discuss defendant's first contention and conclude that the fatal shooting was a natural and probable consequence of a planned physical attack by multiple gang members upon perceived rival gang members even though the shooting occurred at the start of the confrontation and no assault with fists, baseball bats, knives, or other weapons preceded the shooting. A defendant may be convicted under the natural and probable consequences doctrine even if the target criminal act (here, allegedly assault with a baseball bat) was not committed. An aider and abettor may be liable where he intentionally aids one criminal act but the perpetrator actually commits some other, more serious criminal act that is reasonably foreseeable. The ultimate factual question is one of reasonable foreseeability, to be evaluated under all the factual circumstances of the case. Here, evidence establishing the gang-related nature of the planned assault showed that escalation of the confrontation to a deadly level was reasonably foreseeable.

## I. FACTS

The Sureños and Norteños are rival street gangs. Defendant joined the Sureños around 1996, when he was 12 years old. In 1997, at age 13, defendant committed assault with a deadly weapon—he stabbed someone in the back at school. In 1998, at age 14, defendant gave a gun to another Sureño to shoot at a car full of Norteños, and defendant's accomplice fired four or five shots at the vehicle. The juvenile court held defendant responsible for attempted murder and placed him in the California Youth Authority. Defendant remained incarcerated until February 2005, when he was 20 years old. Five months after his release, he participated in the gang shooting at issue here.

The gang attack occurred on the afternoon of July 12, 2005, in a Norteño neighborhood. On that day Francisco Rodriguez was standing outside his apartment building talking with his brother-in-law and a friend when a blue car drove past. Rodriguez was a former Norteño gang member who had left the gang when he married a couple of years earlier. Defendant was driving the blue car, and it was filled with four or five other Sureño gang members, including Josue O. and Daniel V. who were both 15 years old. At age 20, defendant appears to have been the oldest person in the car.

Josue shot and killed Rodriguez, and the victim's brother-in-law described the events at trial. The brother-in-law, Richard Padilla, testified that a blue car slowly drove past them, then returned at an even slower rate of speed. The car was full of occupants. A male exited the car from behind the driver's seat, with a Mexican flag bandana covering the lower part of his face, and approached Rodriguez, Padilla, and Rodriguez's friend, Jose Navarret. The individual approached to within about eight feet of the threesome, then raised his hand in a pointing gesture. Padilla thought the individual had a weapon and ran. Padilla's companions ran, too, but Rodriguez's foot had a malformation that caused him to walk with a "bad limp" and prevented him from running fast. Padilla heard a gunshot and returned to see Rodriguez on the ground.

Navarret, Rodriguez's friend who was talking with him just before the shooting, also testified that a blue car stopped in the street and a male with his face covered immediately exited the vehicle from the rear seat behind the driver and approached the threesome. The threesome ran and, seconds later, Navarret heard a gunshot followed by the sound of running, a door slamming, and a car taking off. He returned to see Rodriguez lying on the ground in a puddle of blood.

Rodriguez died from a gunshot wound to the back of his head. The police found a small kitchen knife near Rodriguez's feet when they arrived on the scene, but his companions never saw a knife and Rodriguez's brother-in-law insisted that Rodriguez was not holding a knife or any weapon when Rodriguez was attacked.

Defendant was arrested hours later driving the blue car, with Josue and another Sureño in the car. Josue admitted being the shooter and said he had obtained the gun from a hidden compartment in the car. A car search found the hidden compartment (then empty) and also uncovered a baseball bat and a stabbing shank.

The gun used to kill Rodriguez was recovered later by the police, from a Sureño named Juan O. Juan testified that Daniel telephoned on the afternoon

of the shooting and arranged to meet him. Daniel arrived in a blue or gray car driven by defendant, accompanied by Josue. Daniel asked Juan to hide two guns and a box of bullets. Daniel told Juan that one of the guns had been used by Josue to shoot a Norteño. Juan hid the weapons but a police search the next morning recovered them. A criminalist testified that one of those guns was the one used to kill Rodriguez.

Defendant admitted being the driver of the vehicle used in the shooting but denied making any plans to kill a Norteño. In a statement admitted into evidence at trial, defendant told the police that he had methamphetamine for "breakfast" and was driving the car with five occupants, "just cruising around," when he passed three men who seemed to be Norteños who were "disrespecting" them. The car occupants asked defendant to drive by again. Defendant did not own the car; he had been asked to drive because he looked older than the others.

Defendant knew there "was gonna be some funk," and "[s]ome gang related ass shit" when he and his friends returned. Defendant said he thought his friends were "gonna go over there and beat the shit out of the guy." Defendant knew there was "a bat and shit" in the car, but claimed he did not know anyone had a gun. Defendant did admit that everyone in the car except him covered their faces when they returned to confront the threesome.

The police officer interviewing defendant asked: "What were you gonna do? What were you planning on doing? Obviously you were gonna handle business, right?" Defendant answered: "Yeah, I was gonna get out and beat up on somebody." But defendant said: "I didn't know they were gonna shoot him or nothing." Defendant said that when he stopped the car in the street, one of the men (Rodriguez) approached the car with a knife in his hand. Josue got out of the car with a gun and said "[w]hat's up puta?," which is a Spanish obscenity. The men ran. Josue fired a shot and a man "dropped." Josue returned to the car, yelled "go, go, go, go," and defendant sped away.

Defendant told the police that, after the shooting, some of the car occupants said the man was dead and kept telling Josue he was a murderer. Josue "was like, nah, fuck that." Defendant said Josue was "scared" by the talk, and Josue told the others that he thought he shot the man in the back. A couple of hours after the shooting, the group heard that the man who was shot was dead. Defendant and his friends met Juan, and Daniel gave Juan the gun used in the shooting.

Defendant's girlfriend testified at trial and cast doubt on defendant's claim that he and his friends had no plan to attack Norteños on the day of the shooting. The girlfriend testified that Josue, Daniel, and three other Sureños

arrived in a blue car on the afternoon of July 12, 2005, and informed defendant that they had just had an argument with Norteños, and the Norteños had thrown things at the car. The group in the car told defendant they wanted to return for "payback." They asked defendant to drive because he looked older. Defendant grabbed the keys and got in the car, according to his girlfriend.

A police officer with expertise in gang behavior testified that there was a gang war being waged on city streets between Sureños and Norteños at the time of the shooting. Violent attacks by gang members upon rivals were frequent and those attacks often involved shootings. The expert testified that the "ultimate goal" in gang culture is to kill a rival gang member. Defendant was a long-term Sureño gang member with a violent past who wrote a letter bragging about "smashing" on Norteños and proudly reporting that a Norteño got "pop[ped]" recently.

The gang expert also testified that there is a gang hierarchy starting at the bottom with associates and topping out at original gangster (OG) status that is achieved by those who have been in the gang a long time and have committed violent acts on rival gang members. The officer said the OG is the "shot caller" on the streets, who directs younger members of the gang. The officer opined that defendant was the "OG" and "shot caller" in the group that attacked Rodriguez. The officer noted that defendant was the oldest person in the group, and the one who had "done the most violent acts against rival gang members." When defendant was interviewed by the police, an officer referred to defendant as "the OG in the car," and defendant did not dispute the characterization. The gang expert also testified that gang members do not cover their faces in most gang attacks because they want notoriety and know a rival gang victim will not report the attack to the police. According to the gang expert, gang members only conceal their faces "[w]hen there's going to be a preplanned shooting, most notabl[y] a murder," because a murder will be reported by citizens and investigated by the police.

## II. TRIAL COURT PROCEEDINGS

The prosecution presented its case, consisting of the testimony summarized above as well as other evidence. The defense did not present any witnesses. In closing argument to the jury, the prosecutor argued that defendant was guilty of first degree murder because he was the "shot caller" in a group that intended to retaliate against the Norteños by killing one of their members, and was a knowing accomplice in the premeditated shooting. Alternatively, the prosecutor argued that defendant was guilty of at least second degree murder because defendant admitted to the police that he intended to commit assault with a deadly weapon (a baseball bat), and the shooting was a natural and probable consequence of the gang assault.

Defense counsel, in his argument to the jury, conceded that defendant was a Sureño gang member but maintained that defendant never intended to kill anyone. Counsel said that the evidence showed only that defendant planned to engage in a gang fight and did not show the intent to use a dangerous weapon in the attack. While defendant knew there was a baseball bat in the car, counsel noted that defendant never told police he intended to use the bat.

The jury began its deliberations on the afternoon of Monday, June 16, 2008. On June 18, 2008, two days later, the jury foreperson accused one of the jurors (S.R., Juror No. 2) of misconduct. The court investigated the matter the next day by questioning the foreperson and Juror S.R. The foreperson said S.R. was claiming familiarity with gangs, drugs, and the neighborhood where the murder occurred, and interjecting her claimed expertise of these matters into the deliberations. The foreperson said he did not remember the juror disclosing these experiences during voir dire and said he thought the juror was being "coach[ed]" or was under some outside "influence."

A questionnaire had been completed by all prospective jurors concerning their personal experiences, and the prosecutor reviewed the questionnaire completed by S.R. The prosecutor argued that the juror lied on the questionnaire by saying she had no knowledge of gangs and was never the victim of a crime. The prosecutor introduced police incident reports showing that S.R. had been the victim of several minor crimes but failed to disclose that fact on the questionnaire. The court discharged S.R. for misconduct and replaced her with an alternate juror. (Pen. Code, § 1089.)

The reconstituted jury resumed deliberations that day, Thursday, June 19, 2008. The court recessed for a long weekend, and deliberations continued on Monday, June 23, 2008. That afternoon, the jury returned its verdict.

The jury found defendant guilty of second degree murder. (Pen. Code, §§ 187, subd. (a), 189.) The jury also found that the murder was committed for the benefit of a criminal street gang and that defendant was a principal in a gang murder committed by the intentional discharge of a firearm. (Pen. Code, §§ 186.22, subd. (b)(1), 12022.53, subds. (d), (e).) The court sentenced defendant to prison for an indeterminate term of 15 years to life for the murder, plus an additional 25 years for the gang-related firearm enhancement. (Pen. Code, §§ 190, 12022.53, subds. (d), (e).) The gang participation enhancement was stayed. (Pen. Code, §§ 186.22, subd. (b)(1), 12022.53, subd. (e)(2).)

## III. DISCUSSION

Defendant argues on appeal that (1) his second degree murder conviction was based on the jury finding that murder was a natural and probable

consequence of assault with a deadly weapon (a baseball bat), and there was insufficient evidence to instruct, and convict, on the natural and probable consequences doctrine because no assault with a bat ever occurred (CALCRIM No. 403); (2) the court's discharge of a deliberating juror was without good cause, and in violation of defendant's constitutional rights to a jury trial and due process of law (Pen. Code, § 1089; U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, §§ 16, 29); and (3) the gang-related firearm enhancement (Pen. Code, § 12022.53, subd. (e)), must be stricken because the jury's murder verdict rests on the natural and probable consequences doctrine, which means that the jury found him to be a principal only in the commission of assault with a deadly weapon and not a principal in the commission of murder. We discuss each of these claims in turn.

## A. Substantial evidence supports the murder conviction

Defendant contends that he "was convicted on the theory that he had intended to aid and abet an assault on perceived rival gang members that would have included use of a bat, which is a deadly weapon, and that murder is a natural and probable consequence of such an attack." Defendant argues that "[i]nsufficient evidence supports the 'natural and probable consequences' theory" because any "intended assault with fists and perhaps a bat" never took place; instead, Josue shot Rodriguez with a handgun. Defendant insists: "There was no evidence from which a jury could reasonably conclude that if [defendant] only intended a fistfight, even a fight with a bat or a club, he should have expected that someone in his car would use a gun." We reject the claim. Substantial evidence supports defendant's murder conviction.

### 1. Introduction

"Substantial evidence is evidence which is ' "reasonable in nature, credible, and of solid value." ' " " 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. [Citation.] 'The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on " 'isolated bits of evidence.' " ' " (*People v. Medina* (2009) 46 Cal.4th 913, 919 [95 Cal.Rptr.3d 202, 209 P.3d 105] (*Medina*).)

Defendant participated with five fellow gang members in a planned physical attack upon perceived rival gang members during which defendant's confederate shot and killed one of the intended victims. The shooting was a

natural and probable consequence of the gang attack, and thus defendant was properly convicted of murder.

### 2. The natural and probable consequences doctrine

■ "The natural and probable consequences doctrine is based on the recognition that those who aid and abet should be responsible for the harm they have naturally, probably, and foreseeably put in motion." (*People v. Avila* (2006) 38 Cal.4th 491, 567 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Accordingly, " '[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.] [¶] . . . A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury." (*Medina, supra*, 46 Cal.4th at p. 920.) The doctrine exists not only in California, but also in most other jurisdictions. (*Gonzales v. Duenas-Alvarez* (2007) 549 U.S. 183, 190–191 [166 L.Ed.2d 683, 127 S.Ct. 815].)

### 3. Gang confrontation cases

Our Supreme Court recently affirmed murder convictions under the natural and probable consequences doctrine on facts similar to those presented here involving a gang confrontation. In *Medina*, three Lil Watts gang members had a fistfight at a party with a rival gang member and, after the fight was broken up, one of the three Lil Watts members shot the rival as he drove away in a car. (*Medina, supra*, 46 Cal.4th at p. 917.) The shooter and the other two Lil Watts members were each convicted of murder. (*Id.* at pp. 917–919.) The court affirmed the convictions imposed on those who participated in the fistfight, but did not fire the gun, concluding that "a rational trier of fact could have found that the shooting of the victim was a reasonably foreseeable consequence of the gang assault . . . ." (*Id.* at p. 922.)

Jurors in a number of cases have found shootings to be foreseeable consequences of gang confrontations, and those findings have been affirmed on appeal. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 10–11 [104 Cal.Rptr.2d 247] [fatal shooting during gang-related fistfight was natural and probable consequence of fistfight]; *People v. Montes* (1999) 74 Cal.App.4th

1050, 1053, 1056 [88 Cal.Rptr.2d 482] [shooting of rival gang member during retreat from fight was natural and probable consequence of gang fight in which defendant wielded a chain]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376 [37 Cal.Rptr.2d 596] [defendant's punching of victim during gang confrontation foreseeably led to fatal shooting of victim by fellow gang member]; *People v. Montano* (1979) 96 Cal.App.3d 221, 226 [158 Cal.Rptr. 47] [defendant's aiding and encouragement of battery on victim foreseeably led to shooting of victim by fellow gang members].)

### 4. *The fatal shooting here was a natural and probable consequence of assault with a deadly weapon*

The jury was instructed that, to convict defendant of second degree murder or voluntary manslaughter under the natural and probable consequences doctrine, it would have to find that (1) "defendant knowingly and intentionally aided and abetted an assault with a deadly weapon"; (2) "a co-participant in that offense committed the crime of murder or voluntary manslaughter"; and (3) "[u]nder all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder or voluntary manslaughter was a natural and probable consequence of the commission of an assault with a deadly weapon." The type of deadly weapon (whether a gun, baseball bat, or shank) was not specified in the jury instructions.[1] The jury found defendant guilty of second degree murder.

The evidence here strongly supports a finding that the fatal shooting was a natural and probable consequence of defendant's aiding and abetting an assault with a deadly weapon during a gang confrontation. Defendant disputes the sufficiency of the evidence supporting that finding by relying upon isolated pieces of evidence favoring his version of events, specifically his self-serving statements to the police that the attack was unplanned and the presence of a gun unknown. But we must view the evidence in the light most favorable to the prosecution and not, as defendant does, in the light most favorable to the defense. (*Medina, supra*, 46 Cal.4th at p. 922.)

The prosecution's evidence includes the testimony of a gang expert who explained that there was a gang war being waged between Sureños and Norteños at the time of the shooting. Violent attacks by gang members upon rivals were frequent and those attacks often involved shootings. The expert testified that the "ultimate goal" in gang culture is to kill a rival gang member. Evidence at trial also established that defendant was a long-term

---

[1] A court must identify the target crime relied upon by the prosecution, and the court did so here by identifying assault with a deadly weapon as the target crime. (*People v. Prettyman* (1996) 14 Cal.4th 248, 267–268 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) Defendant does not question the adequacy of the jury instruction on appeal.

Sureño gang member with a violent past who wrote a letter bragging about "smashing" on Norteños and proudly reporting that a Norteño got "pop[ped]" recently. Defendant's girlfriend testified that defendant's Sureño confederates told defendant, shortly before the shooting, that they had had an argument with Norteños and the Norteños had thrown things at the car. The Sureños told defendant they wanted to return for "payback," and defendant got into the car with his five confederates. The gang expert opined that gang members would take guns with them when entering a rival gang's territory to retaliate. Evidence seized after the shooting showed that the car driven by defendant contained two guns, a box of bullets, a baseball bat, and a stabbing shank. Defendant admitted his intention to attack the perceived rival gang members when he drove back to confront them, whatever his intention when he and his confederates first entered the car.

Defendant argues that his case is distinguishable from other gang attacks where homicide was found to be foreseeable because any "intended assault with fists and perhaps a bat" never took place; instead, Josue shot Rodriguez with a handgun. But we cannot assume that the jury found the bat, and not the gun, to be the deadly weapon in the targeted assault. An assault with a gun did occur. In finding defendant guilty of second degree murder, the jury may well have found that defendant knew that Josue intended to shoot at Rodriguez (while lacking specific intent to kill) and that Rodriguez's death was a foreseeable consequence of the shooting. Defendant told police he did not know there were guns in the car but the jury was free to disbelieve defendant on this point. A rational trier of fact could conclude that the car occupants did know there was a gun in the car and planned to shoot a Norteño with the intention of either killing or injuring the victim.

■ Even if the jury credited defendant's claimed ignorance of the gun—and found the deadly weapon in the targeted assault to be a baseball bat instead of a gun—the jury could still find murder to be a foreseeable consequence of the violent gang confrontation. "[P]rior knowledge that a fellow gang member is armed is not necessary to support a defendant's murder conviction as an aider and abettor." (*Medina, supra,* 46 Cal.4th at p. 921.) "[A]lthough evidence indicating whether the defendant did or did not know a weapon was present provides grist for argument to the jury on the issue of foreseeability of a homicide, it is not a necessary prerequisite." (*People v. Godinez* (1992) 2 Cal.App.4th 492, 501, fn. 5 [3 Cal.Rptr.2d 325].) In the context of a gang war, a jury could rationally conclude that an attack by six gang members wielding a baseball bat upon rival gang members could escalate into a fatal confrontation.

■ The fact that the baseball bat was never actually used in the confrontation does not change the analysis. Defendant was still properly found liable

for the homicide as a natural and probable consequence of the planned gang assault. In arguing otherwise, defendant notes that the California Supreme Court once commented: "[W]e need not address, and therefore we do not decide, whether a defendant may be convicted under the 'natural and probable consequences' doctrine when the target criminal act was not committed." (*People v. Prettyman, supra,* 14 Cal.4th at p. 262, fn. 4.) The comment reflects the insight that foreseeability of harm in a given case is likely to be attenuated if the target criminal act is only contemplated and never committed. But the comment does not compel a categorical rule that foreseeability of harm never exists if the target criminal act was not committed, and a different criminal act was committed. Aiders and abettors are "responsible for the harm they have naturally, probably, and foreseeably put in motion." (*People v. Avila, supra,* 38 Cal.4th at p. 567.)

The California Supreme Court has emphasized that "the ultimate factual question is one of reasonable foreseeability, to be evaluated under *all* the factual circumstances of the case." (*Medina, supra,* 46 Cal.4th at p. 927.) "[A] defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for *any* reasonably foreseeable offense committed as a consequence by the perpetrator." (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392], italics added.) Therefore, it is not true that "the perpetrator must actually commit the criminal act which the aider and abettor intentionally aids and encourages. . . . [T]he aider and abettor may be liable where he intentionally aids and encourages one criminal act, but the perpetrator actually commits some other, more serious, criminal act." (*People v. Laster* (1997) 52 Cal.App.4th 1450, 1464–1465 [61 Cal.Rptr.2d 680].)

 Defendant seems to concede the possibility that an aider and abettor may properly be convicted under the natural and probable consequences doctrine when the target criminal act was not committed but argues that, in this case, there is "no logical basis for a conviction." Defendant asserts that "[t]here was no evidence from which a jury could reasonably conclude that if [defendant] only intended a fistfight, even a fight with a bat or a club, he should have expected that someone in his car would use a gun." While the assertion may have some force in a common fistfight, it has no force in the context of the gang attack at issue here. This was not a spontaneous fistfight but a pitched battle in an ongoing gang war. Our Supreme Court has recognized that the gang-related nature of an assault—even one without weapons—may provide the trier of fact with sufficient evidence to conclude that "escalation of the confrontation to a deadly level was reasonably foreseeable . . . ." (*Medina, supra,* 46 Cal.4th at pp. 922–923.) In *Medina,*

sufficient evidence of a foreseeable escalation from a fistfight to a shooting was found where there was testimony that the attacking gang used deadly violence to gain respect, and gang members were commonly armed and regularly committed gun offenses. (*Id.* at p. 923.) Such is the case here. ■ The jury could reasonably conclude that a reasonable person in defendant's position would have known that escalation was likely to occur when defendant and five other Sureños confronted three perceived Norteños with the intention of physically attacking them—even if the attack was originally intended as a fistfight. Josue's shooting of Rodriguez was a reasonably foreseeable consequence of the assault defendant aided and abetted.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV. DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., and Rivera, J., concurred.

A petition for a rehearing was denied March 11, 2010, and appellant's petition for review by the Supreme Court was denied May 20, 2010, S181092.

.

---

*See footnote, *ante,* page 1440.