Filed 11/3/15  P. v. Arismendez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C072827 |
| v. | (Super. Ct. No. CRF120605) |
| ROLANDO ARISMENDEZ  et al., | |
| Defendants and Appellants. | |

This case arises out of a drive-by shooting in a Sureño gang neighborhood by members and associates of the rival Norteño gang.  A jury convicted defendants Rolando Arismendez, German Yovani Quezada, and Juan Manuel Reyes of conspiracy to commit attempted murder (Pen. Code, § 182, subd. (a)(1)),[1] attempted premeditated murder (§§ 187, 664), and criminal street gang activity (§ 186.22, subd. (a)).  The jury also found

---

[1]      Undesignated statutory references are to the Penal Code.

1

true the allegations that the defendants committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), a principal personally discharged a firearm (§ 12022.53, subd. (e)(1)), and the attempted murder was committed with premeditation (§§ 187, subd. (a), 189, 664). The trial court subsequently granted the prosecution's motion to dismiss the defendants' convictions for conspiracy to commit attempted murder.

Arismendez was additionally convicted of possession of a firearm by a person previously convicted of criminal street gang activity (§ 186.22, subd. (a)), being a felon in possession of a firearm (former § 12021.1, subd. (a)(1); Stats. 2009, ch. 121, § 1), and being a felon in possession of ammunition (former § 12316, subd. (b)(1); Stats. 2009, ch. 628, § 5). The jury found true the allegation Arismendez furnished a firearm to another person for the purpose of aiding and abetting the commission of a felony (§ 12022.4, subd. (a)). The trial court found Arismendez had previously been convicted of two prior felonies for which he had served separate prison terms. (§ 667.5, subd. (b).)

Quezada and Reyes were also convicted of shooting at an inhabited dwelling. (§ 246.) The jury found true the allegations that Quezada and Reyes each personally and intentionally discharged a firearm (§ 12022.5, subd. (a)) and carried a firearm during the commission of a gang-related crime (former § 12021.5, subd. (a); Stats. 2009, ch. 171, § 4).

The trial court sentenced Arismendez to serve an indeterminate term of 7 years to life in prison with a 20-year firearm enhancement in addition to a determinate term of 9 years. Quezada and Reyes both were sentenced to serve an indeterminate term of 15 years to life with a 20 year firearm enhancement.

On appeal, Arismendez contends (1) insufficient evidence supports his conviction of attempted premeditated murder, and (2) the evidence was insufficient to convict him of

2

being a felon in possession of ammunition. Quezada argues (3) the trial court erred in not instructing that the victim's testimony required corroboration because the victim was an accomplice, and (4) the trial court should have instructed the jury on the lesser included offense of attempted voluntary manslaughter. Reyes contends (5) the trial court gave a flawed instruction on premeditation that allowed the jury to base his conviction on the mental state of another defendant. Each of the defendants joins in the contentions of the others insofar as advantageous to him.

We conclude the evidence showing Arismendez provided guns, ammunition, and transportation for the drive-by shooting with intent to orchestrate a killing was sufficient to convict him of attempted premeditated murder. We also conclude the evidence established he was a felon in possession of the ammunition found in the trunk of his friend's car. We reject Quezada's assertion of instructional error because a victim of a crime cannot be an accomplice to the same crime. We also reject Quezada's claim the trial court should have instructed on attempted voluntary manslaughter. The record does not show provocation by the victim upon which an attempted voluntary manslaughter conviction could have been based. Finally, we conclude the instructions did not allow the jury to base one defendant's conviction of attempted premeditated murder on the mental state of another defendant. Accordingly, we affirm.

FACTUAL AND PROCEDURAL HISTORY

*Prosecution Evidence*

In October 2011, Jose Luis Delgado Tarango (Delgado)[2] was an active member in the Sureño criminal street gang. That month, Delgado posted his home address on Facebook "[j]ust to mock" members of a rival gang, the Norteños. Like most other

---

[2] For the sake of clarity, we refer to Delgado by the name he normally uses.

3

Sureño gang members who lived in Woodland, California, Delgado resided in a neighborhood called Yolano Village. Delgado lived on Donnelly Circle and considered himself a protector of his neighborhood.

At 3:00 p.m. on November 15, 2011, Quezada sent a text message to Arismendez stating, "Can u get a whip, I almost got ran up on." At trial, Woodland police detective John Perez explained a "whip" refers to a car or transportation. About two minutes later, Arismendez replied, "Got BMZ car" -- referring to his "baby's mama['s]" car. Yvette Adame, the mother of Arismendez's child, owned a white Chevrolet Malibu with an orange "W" sticker on the rear windshield. At almost the same time, Quezada sent someone else a text message that he needed to find someone with a license because he was "tryna mob around."

Around 5:00 or 6:00 p.m., Delgado received a phone call that some Norteños were driving around his neighborhood. Delgado and another Sureño got into their car and chased another car containing five or six Norteños out of the Sureño territory of Yolano Village. The car was white and had an orange Woodland High School "W" sticker on it. If Delgado would have had a gun, he would have shot at the Norteños. He and the other Sureño ended up chasing them away.

Shortly after 10:00 p.m., Quezada sent a text message to Arismendez stating, "Clean the clip and gun." A few minutes later Arismendez replied, "Done."

Casey Moore was 17 or 18 years old in November 2011. After living in Indiana for a few years, Moore had recently returned to Woodland. He knew Arismendez through his mother and a few of her friends. Moore was interested in becoming a Norteño gang member and asked Arismendez about joining the gang.

4

During most of the day on November 15, 2011, Moore was hanging out with his friend Tomas Ramirez. Ramirez drove a white Chevrolet Malibu.[3] Sometime in the late afternoon, Moore accompanied Ramirez in giving Ramirez's cousin a ride from Davis to Woodland. When they ran low on gasoline, Moore called Arismendez to borrow money. Arismendez agreed to give them gas money but said they would also have to give his cousin a ride.

Moore and Ramirez drove to an apartment complex in Woodland to meet Arismendez. At the apartment complex, Arismendez introduced Moore and Ramirez to the person who lived there, Kalynn Rodriguez. Rodriguez and Arismendez had been friends for about a year. Inside Rodriguez's apartment, Moore watched Arismendez clean two guns and put them into a bag. Arismendez's cousin, Reyes, showed up at the apartment. Arismendez and Reyes talked about going to "fuck up some scraps." Moore understood this to mean they were going to "jump" or "fight" a member of the Sureño gang. Moore thought they were taking Reyes to fight someone. For giving Reyes a ride, Ramirez received $20 for gas.

Ramirez, Moore, and Reyes drove to a gas station and filled gas. Reyes instructed them to pick up an additional passenger. Ramirez and Moore drove to another apartment complex in Woodland and picked up Quezada. They drove around for a while before stopping to let Quezada pick up some marijuana. At Quezada's instruction, they drove to a house where they picked up a male who was never positively identified at trial. The prosecution referred to this fifth passenger as JD Salas, a name we use for ease of reference. Moore took over driving because Ramirez did not know his way around

---

**3**     It appears to be a coincidence Ramirez and Adame both drove white Chevrolet Malibu cars in November 2011.

5

Woodland. They drove around for a while. Moore realized what they were doing when he "saw the guns" as they neared Sureño territory at Yolano Village. The guns were the same ones Moore saw Arismendez put into a bag at the apartment.

Moore drove slowly down Donnelly Circle. He saw a gun in Reyes's pocket and observed as Quezada drew a snub-nose revolver. Suddenly, Reyes, Quezada, and Salas started shooting out of the car. Reyes fired from the front passenger seat, Quezada fired from the rear passenger window, and Salas sat on the doorframe and fired over the roof of the car. Ramirez was leaning forward and covering his head. The shooting lasted 10 to 15 seconds.

Delgado was standing in front of his house and talking with his neighbor, Jenny Morales. Suddenly, "[b]ullets [were] flying everywhere." Delgado saw a white car carrying four people, with the two passengers in the rear seats firing at him. It was obvious to Delgado the bullets were coming from the car because it was the only one in the area. He also saw a big spark coming from the car. The car sped off.

Delgado did not have a gun when the shooting started. However, he did have an Airsoft BB gun hidden in a nearby trash can. Delgado kept the BB gun in an outside trash can because he feared the police would see him with it, think it was real, and shoot him. Also, Delgado was on searchable probation and did not want to be caught with the BB gun. Delgado retrieved the BB gun after the shooting was over. Delgado's mother came out of the house and asked if he was all right. She took the BB gun away and threw it into the trash.

Moore panicked when the shooting started. At trial, he could not remember whether he hit the brakes or the gas pedal. Reyes grabbed the steering wheel and asked, "What the fuck are you doing?" No one had control over the car and it crashed through a

fence. The airbags deployed, everyone got out and started running. Moore heard Quezada say, "Fuck, I shot my hand . . . ."

Delgado heard the car crash and ran toward it. The car had crashed, its doors stood open, and police officers surrounded it. Delgado turned to run to a friend's house, but the police caught him.

On the evening of the shooting, Woodland Police Officer Matthew Gray was on duty when he heard about eight gunshots followed by the sound of tires skidding. A few minutes later, Officer Gray found a white Chevrolet Malibu abandoned in Gonzalez Park, near Delgado's residence. The car had crashed through a fence and come to rest in the bark chips of a children's play area. Woodland City Police Officer Francisco DeLeon arrived to find the car's lights were on, the engine running, and the airbags deployed. The rear driver's side window was broken and the front windshield had a spider line crack. On the rear passenger floorboard of the car, Officer Gray found a Davis Industries .380-caliber pistol, a bandana, a red shirt, and several other items. A search revealed no bullet holes or BB pellets inside the car. However, officers found a dental retainer case labeled "Tomas Ramirez," a CD labeled "Ramirez," and a Kyocera cell phone in the car.

Woodland Police Officer Lewis LeFlore apprehended Reyes shortly after the shooting while Reyes was running in the Yolo Village area. After handing Reyes over to other police officers for transport, Officer LeFlore drove to the hospital to investigate a report of a gunshot victim. At Woodland Memorial Hospital, Officer LeFlore found Quezada in the emergency room. The tips of Quezada's index fingers were nearly severed from his hands, which were darkened in a way consistent with powder burns. Quezada's clothes had blood and shards of glass on them.

7

Officer DeLeon returned to the site of the shooting and found eight shell casings in the street: three from a .45-caliber weapon and five from a .380-caliber weapon. Delgado's residence had five bullet holes in it. Officer Gray would later find a .45-caliber Glock semi-automatic pistol about 150 yards from the crashed car.

At 11:14 p.m., Quezada's phone received a text message stating, "At white sudan? They sed donneley. They sed ran on feet hit ghost mirror on beamer." Around 4:00 a.m. the next day, Salas sent a text to Quezada's phone saying, "I think al da homiez got lockd up bro."

Rodriguez owned a Toyota Corolla she had used to give Arismendez a ride to the apartment where he provided the guns to Reyes. Rodriguez also gave Arismendez a ride the morning after the shooting. Arismendez had a stomach flu and waited in the car while Rodriguez and her daughter went inside a house. When Rodriguez came back out, Arismendez was talking to the police. Eventually, Rodriguez gave Arismendez a ride back to her apartment where he lay down under a blanket. Soon after, Woodland police officer Thomas Davis knocked on Rodriguez's door and demanded to talk to Arismendez. Rodriguez initially denied Arismendez was inside, but Arismendez soon came to the door. Officer Davis arrested Arismendez.

The police searched Rodriguez's car and found a .380-firearm magazine containing a bullet in the trunk of her car. Forensic testing established the magazine was compatible with the .380-pistol found in the car used during the drive-by shooting. According to Rodriguez, the trunk of her car would not lock and everyone in her neighborhood was aware the trunk was always accessible.

Salas was arrested for stabbing Delgado as he was walking down the street later that day.

A forensic search of Arismendez's phone yielded photographs of a gun and bullets that had been taken with Arismendez's phone.

Woodland police officer Omar Flores testified as an expert on criminal street gangs. Officer Flores explained the Norteños are a criminal street gang that has adopted signs and symbols as a way of self-identification. The Norteños' primary purpose is to commit crimes that elicit fear and respect. Commonly, Norteños commit offenses such as assault and battery, shooting at inhabited dwellings, weapons possession, and attempted murder. The Norteños and Sureños view each other as enemies and will retaliate when they perceive the rival gang to be disrespectful. Officer Flores stated that, at the time of the shooting, Arismendez and Quezada were active Norteño gang members and Reyes was an active associate of the gang. Given a hypothetical situation with facts mirroring the evidence introduced by the prosecution, Officer Flores stated a drive-by shooting would be for the benefit of the Norteño gang.

### *Defense Evidence*

Jeremy Jamison was called as a witness by Reyes's trial counsel. Jamison met Ramirez and Moore in the protective custody unit of the county jail in 2012. Ramirez told Jamison he and Moore had "made up a lot of stuff so that he could get a deal and go home." Ramirez said he knew all along they were going to a drive-by shooting and he had actually been one of the shooters. The victim shot back and continued doing so even as the car left the scene. When Ramirez and Moore realized they could not escape the scene, they came up with a story that they had been carjacked. Ramirez thought the police "were buying his whole story about being carjacked and all of that and everything until one of the police officers or somebody looked down and seen that he had . . . blood on his pants or shoes or something and that's when they cuffed him up and took him into

9

custody." Moore tried to get away by faking a seizure to get an ambulance to take him away.

Jamison relayed this information by writing a letter to the trial judge in October 2012. According to Jamison, the letter found its way to the trial attorneys, who in turn showed it to Ramirez and Moore. Shortly thereafter, Ramirez and Moore confronted Jamison in jail and threatened to hurt him. They forced Jamison to write another letter to the judge that stated the first letter had been a forgery. After writing the second letter, Jamison slit his wrists in an unsuccessful suicide attempt to get away from Ramirez and Moore.

At trial, Jamison testified the first letter had been the truth. On cross-examination, Jamison admitted he had written letters to judges regarding other inmates' cases. Jamison further testified he believed "satellite techs" had used wireless technology to take over the brain of his attorney. Jamison noted the cell phone company Nokia was working on a magnetic ink that could be used for tattoos that subcutaneously alert people to their ringing cell phones. Jamison suspected this type of technology was being used to control his attorney, who was present in court during his testimony.

DISCUSSION

I

### Sufficiency of the Evidence for Attempted Murder (*Arismendez*)

Arismendez argues insufficient evidence supports his conviction of premeditated attempted murder. We are not persuaded.

#### A.

#### Standard of Review

As the California Supreme Court has explained, " 'In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States

Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' ([*People v*.] *Rowland* [(1992)] 4 Cal.4th [238,] 269, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319, 61 L.Ed.2d 560.) We apply an identical standard under the California Constitution. (*Ibid*.) 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) The same standard also applies in cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.)" (*People v. Young* (2005) 34 Cal.4th 1149, 1175.)

If the evidence supports the jury's findings, the opinion of a reviewing court that the circumstances might also support a contrary finding does not allow for reversal of the judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Thus, we review the whole record rather than isolated portions. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) With these principles in mind, we turn to the evidence introduced at trial.

**B.**

***Arismendez's Role in Orchestrating the Attempted Murder***

Arismendez's insufficiency of the evidence argument attempts to downplay his role in the drive-by shooting. Thus, he asserts he was not present during the drive-by shooting and did no more than supply two of the guns used. He also notes testimony by the prosecution's gang expert, Officer Flores, there "could be a possibility" a participant in a gang related drive-by shooting does not intend to kill anyone. On these grounds,

11

Arismendez argues the evidence did not show he had an intent to aid and abet the attempted murder committed by the other defendants.

Reviewing the record as a whole, we glean a different picture of Arismendez's role in the drive-by shooting. Based on the entire record, we conclude the evidence supports the jury's finding Arismendez intended to orchestrate a killing. On this point, we note the evidence had to show only that Arismendez had a premeditated intent to kill. The attempted murder conviction did not require proof Arismendez intended to kill Delgado in particular or even that the victim be a Sureño gang member. A person who intends to kill is guilty of attempted murder even if the person has no specific target in mind. (*People v. Stone* (2009) 46 Cal.4th 131, 140 [holding attempted murder conviction does not require proof the killer has any specific victim in mind]; *People v. Ervine* (2009) 47 Cal.4th 745, 786 [same].)

Rather than having supplied only two guns ahead of time, substantial evidence showed Arismendez orchestrated the attempted murder. Although Officer Flores did note it was a "possibility" someone participating in a drive-by shooting might not want to kill, he stated that "if somebody is doing a drive-by, it would mean that you want to strike a target, you want to shoot somebody." More importantly, Officer Flores explained that "drive-bys are not currently sanctioned in the Norteño gang culture . . . ." For a Norteño to commit a drive-by shooting, "there's got to be somebody to give him the green light to authorize this kind of crime."

In November 2011, Arismendez was more than a rank-and-file member of the Norteño gang. He was a senior member who made decisions and influenced junior gang members. Moore's interest in becoming a Norteño led him to talk to Arismendez about joining the gang. Arismendez was also the person who Quezada contacted for guns and

transportation. Arismendez and Reyes discussed the plan to "fuck up some scraps" shortly before Arismendez handed the guns to Reyes.

As a senior Norteño gang member, Arismendez's absence at the scene of the crime did not attenuate the degree of his participation. Officer Flores explained that "if you get an older, more charismatic, more sophisticated, more influential gang member who is orchestrating this, he is providing the weapons, providing the transportation, somehow got a vehicle, that person doesn't really need to be at the scene" of the drive-by shooting. Officer Flores concluded Arismendez was the "influential gang member" in the drive-by shooting.

In short, Arismendez coordinated the transportation, provided the firearms, and helped formulate the plan for the drive-by shooting. The jury had sufficient evidence to conclude Arismendez orchestrated the attempted murder carried out by junior gang members and associates. Moreover, the jury had evidence that, in the absence of Arismendez's authorization, no drive-by shooting would even have been allowed under the general prohibition on drive-by shootings without permission from a senior Norteño gang member.

To support his contention his participation does not provide sufficient evidence of attempted murder, Arismendez cites several cases where an alleged accomplice was found to be a principal in a murder or attempted murder. However, these cases involve different facts and a different legal theory. In *People v. Medina* (2009) 46 Cal.4th 913 (*Medina*), *People v. Ayala* (2010) 181 Cal.App.4th 1440 (*Ayala*), *People v. Montes* (1999) 74 Cal.App.4th 1050 (*Montes*), *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*), and *People v. Montano* (1979) 96 Cal.App.3d 221 (*Montano*), the cases involve gang confrontations that led to a shooting. In these cases, the courts upheld the attempted murder or murder convictions for aiders and abettors based on the natural and probable

13

consequence doctrine. In essence, the courts held a shooting is a natural and probable consequence of a gang confrontation. (*Medina, supra*, 46 Cal.App.4th at pp. 920-921; *Ayala, supra*, 181 Cal.App.4th at p. 1449; *Montes, supra*, 74 Cal.App.4th at pp. 1055-1056; *Olguin, supra*, 31 Cal.App.4th at p.1376, *Montano, supra*, 96 Cal.App.3d at p. 227.) In *In re Jose D.* (1990) 219 Cal.App.3d 582, the court held there was sufficient evidence the defendant aided and abetted a shooting when he drove the car and deliberately maneuvered it so the passenger could point a gun at the victims. (*Id.* at p. 585.) Unlike all these cases, Arismendez was not present at the scene of the attempted murder. But the fact a defendant is not present at the scene of the crime does not mean the defendant is not an aider and abettor or principal. "It is not necessary that one be physically present when a crime is committed to abet or encourage its commission." (*People v. Bohmer* (1975) 46 Cal.App.3d 185, 199; accord *People v. Sarkis* (1990) 222 Cal.App.3d 23, 27.) As we have discussed, there was sufficient evidence Arismendez orchestrated the shooting of the victim.

We reject Arismendez's contention his acquittal on the charge of aiding and abetting a shooting at an inhabited dwelling undermines his conviction of attempted murder. The evidence supported a jury determination that Arismendez intended the shooting to target Delgado. According to Officer Flores, the highest ranking Norteños declared a moratorium on drive-by shootings after innocent children were killed in a Southern California drive-by shooting. Given this history, the evidence and the jury verdicts were consistent with the conclusion Arismendez would allow a Sureño to be targeted while disallowing random fire on the Sureño's, or anyone's, residence.

Arismendez misplaces his reliance on isolated language in *People v. Williams* (1997) 16 Cal.4th 635 (*Williams*), disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, at page 421, footnote 22. In *Williams*, the defendant argued the

14

trial court should have instructed that Ida Moore, who drove defendant to the scene of the crime, and DeLisa Brown, who helped dispose of the murder weapon, were both accomplices as a matter of law.  (*Williams,* at pp. 679-680)  This would have meant the trial court would also have had to instruct the jury that the testimony of Moore and Brown required corroboration.  (*Id.* at p. 679; § 1111.)  The California Supreme Court concluded the evidence did not inextricably show Moore and Brown intended to aid and abet four murders.  Consequently, the trial court did not have an obligation to instruct that Moore and Brown were accomplices *as a matter of law*.  As the *Williams* court held, "the trial court correctly declined to instruct the jury that Moore and Brown were accomplices.  There was evidence that both women provided assistance to defendant and his two cohorts:  Moore by driving the van to and from the scene of the murders, and Brown by helping Cox dispose of the murder weapon.  But this evidence of Moore's and Brown's criminal culpability was not so clear and undisputed that a single inference could be drawn that either one would be liable for the 'identical offense[s]" charged against defendant, namely, four counts of special circumstance murder."  (*Id.* at pp. 679-680.)

The holding in *Williams, supra,* 16 Cal.4th 635 does not help Arismendez because his contention is not about misinstruction on accomplice testimony, but the sufficiency of the evidence showing attempted premeditated murder.  As we have explained, the evidence at trial provided substantial evidence for the jury's conclusion that defendant orchestrated the drive-by shooting.  Thus, we reject Arismendez's insufficiency of the evidence claim as to his conviction for premeditated attempted murder.

## II

### *Sufficiency of the Evidence for Possession of Ammunition by Arismendez*

Arismendez next contends the evidence was insufficient for his conviction of being a felon in possession of ammunition. Specifically, he claims the evidence did not show *he* possessed the ammunition found in the trunk of the car owned and driven by his friend, Rodriguez. We conclude substantial evidence supports his conviction of former section 12316, subdivision (b)(1) (Stats. 2009, ch. 628, § 5).

### A.

### *Standard of Review*

In reviewing this claim of insufficient evidence, we apply the same substantial evidence standard of review articulated in part I A., *ante*. This means that "the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury, believing other evidence or drawing other inferences, might have come to a contrary conclusion." (*People v. Brown* (1982) 138 Cal.App.3d 832, 834.)

### B.

### *Being a Felon in Possession of Ammunition*

Subdivision (b)(1) of former section 12316, as applicable to Arismendez, provided that "[n]o person prohibited from owning or possessing a firearm under Section 12021 or 12021.1 of this code or Section 8100 or 8103 of the Welfare and Institutions Code shall own, possess, or have under his or her custody or control, any ammunition or reloaded ammunition." (Stats. 2009, ch. 628, § 5.) For purposes of this section, "[p]ossession may

16

be physical or constructive, and more than one person may possess the same contraband. (*People v. Montero* (2007) 155 Cal.App.4th 1170, 1175–1176.) 'Conviction is not precluded . . . if the defendant's right to exercise dominion and control over the place where the contraband was located is shared with another. [Citations.]' (*People v. Valerio* (1970) 13 Cal.App.3d 912, 921.)" (*People v. Williams* (2009) 170 Cal.App.4th 587, 625.) However, proof a defendant had the opportunity of access to a place where a prohibited item is stored, without more, will not support a finding of unlawful possession. (*People v. Mitchell* (1975) 53 Cal.App.3d 21, 25.) Whether a defendant exercised the sufficient control over an item to establish constructive possession depends on the totality of the circumstances of the particular case. (*People v. Roberts* (1964) 228 Cal.App.2d 722, 727.)

## C.

### *Evidence of Arismendez's Possession of Ammunition*

Here, the evidence showed Arismendez rode in Rodriguez's car on the way to her apartment where they met with Moore, Ramirez, and Reyes. Arismendez cleaned two guns inside Rodriguez's apartment before she gave him another ride in her car. One of the guns was a .380-caliber. According to the text message exchange between Quezada and Arismendez, Arismendez also had an ammunition clip. It was a .380-caliber clip the police found when they searched Rodriguez's car the day after the shooting. Forensic testing established the clip and bullet inside fit into the .380-caliber gun used during the drive-by shooting. The day after the drive-by shooting, Arismendez caught another ride with Rodriguez in her car. As she ran an errand, Arismendez waited alone in a car that was known to have an accessible trunk.

Although Arismendez did not have exclusive control over the trunk of Rodriguez's car, he had a close connection to both Rodriguez and the car in which he

17

rode before and after the drive-by shootings.  Based on the totality of the evidence, the jury reasonably inferred the clip and bullet found in the trunk belonged to Arismendez.

Our conclusion is consistent with *People v. Cordova* (1979) 97 Cal.App.3d 665. The defendant in *Cordova* challenged his conviction of being a previously convicted felon in possession of a firearm on grounds of insufficient evidence.  (*Id.* at p. 668.)  The *Cordova* court rejected the challenge because the evidence showed the police discovered the firearm in the trunk of the car driven by defendant but owned by his father.  (*Ibid.*) Additional evidence showed other members of defendant's family regularly drove the car and the trunk was locked with a key that was claimed to have been lost since before defendant was released from prison.  (*Ibid.*)  Nonetheless, the *Cordova* court concluded this evidence "amply supported" the firearm possession conviction.  (*Id.* at p. 670.) Likewise Arismendez's multiple rides in the car sufficiently tied him to the clip and bullet found in the unlocked trunk.

We reject Arismendez's reliance on *People v. Myles* (1975) 50 Cal.App.3d 423. *Myles* involved a conviction for receiving stolen property in the form of two television sets found in the trunk of the car in which defendant was riding as a passenger.  (*Id.* at pp. 426-427.)  Although the defendant in *Myles* had previously been seen among several people who were looking into the trunk, nothing else connected him with the televisions sets.  (*Ibid.*)  The *Myles* court reversed on grounds of insufficient evidence.  (*Id.* at pp. 428-429.)  By contrast, Arismendez was connected to the clip and ammunition in the trunk because it matched a gun he had cleaned the previous night, his prior acknowledgment in a text message that he had cleaned a gun clip, and his relationship with Rodriquez.  Moreover, the evidence showed Arismendez rode in Rodriguez's car before and after the drive-by shooting.  Taken together, we conclude there was sufficient

18

evidence to show Arismendez possessed the clip and bullet in violation of former section 12316, subdivision (b)(1) (Stats. 2009, ch. 628, § 5).

## III

### *Failure to Instruct on Victim's Testimony*

Quezada contends the trial court erred in refusing to instruct the jury that Delgado was an accomplice whose testimony required corroboration. The contention has no merit because a victim of a crime cannot be also an accomplice to the same crime.

### A.

### *What Constitutes an Accomplice*

Section 1111 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution *for the identical offense charged against the defendant* on trial in the cause in which the testimony of the accomplice is given." (Italics added.) Consequently, " 'an accomplice must stand in the same relation to the crime as the person charged therewith and must approach it from the same direction.' " (*People v. De Paula* (1954) 43 Cal.2d 643, 647, quoting *People v. Baskins* (1946) 72 Cal.App.2d 728, 731.) Or, to put it another way, an accomplice's "liability as such depends on whether he [or she] promotes, encourages, or assists the perpetrator and shares the perpetrator's criminal purpose." (*People v. Sully* (1991) 53 Cal.3d 1195, 1227.)

**B.**

***Delgado did not Share the Purpose of the Drive-by Shooting***

In this case, Delgado was the victim of a drive-by shooting perpetrated by members of a rival gang. Quezada's argument about the reciprocal hatred of the Norteño and Sureño criminal street gangs misses the crucial point: Delgado did not intend to commit an attempted murder of himself for the benefit of a rival gang. As the victim of the attempted murder, Delgado could not have been an accomplice. Consequently, the trial court properly rejected a request by Delgado's trial attorney to instruct the jury Delgado's testimony required corroboration as an accomplice to the charged offenses.

**IV**

***Failure to Instruct on Attempted Voluntary Manslaughter***

Quezada contends the trial court should have instructed the jury on the lesser included offense of attempted premeditated murder, namely attempted voluntary manslaughter. Quezada advances a view of the evidence in which Delgado was an aggressor by firing his BB gun at the white Chevrolet used in the drive-by shooting. We reject Quezada's characterization of the evidence and assertion Delgado provoked the attempted homicide. In the absence of evidence of provocation, the trial court did not have a duty to give an attempted voluntary manslaughter instruction.

**A.**

***The Trial Court's Duty to Instruct the Jury on Lesser Included Offenses***

In a criminal trial, the court has a duty to instruct the jury on any offense "necessarily included" in the charged offense if substantial evidence supports a finding of the lesser crime's commission. (*People v. Birks* (1998) 19 Cal.4th 108, 112.) "[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the

greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*Id*. at pp. 117-118.) "This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the most accurate verdict permitted by the pleadings and the evidence." (*Ibid*.)

The trial court must instruct on lesser included offenses even in the absence of a request so long as a reasonable jury could find the evidence of the lesser offense persuasive. (*People v. Lewis* (2001) 25 Cal.4th 610, 645.) "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1215, quoting *People v. Cunningham* (2001) 25 Cal.4th 926, 1008.) In assessing a claim of failure to instruct on a lesser included offense, "we review independently the question whether the trial court failed to instruct on a lesser included offense." (*Cole, supra*, at p. 1215.)

**B.**

*Attempted Voluntary Manslaughter*

The California Supreme Court has explained, " 'Manslaughter, an unlawful killing without malice, is a lesser included offense of murder.' (*People v. Koontz* (2002) 27 Cal.4th 1041, 1086; see § 192.) 'Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.' (*People v. Lee* (1999) 20 Cal.4th 47, 59; *People v. Rios* (2000) 23 Cal.4th 450, 461 [certain mitigating circumstances will 'reduce an intentional, unlawful killing from murder to voluntary manslaughter "by negating the element of malice"' (italics omitted)].) 'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim

21

[citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' (*People v. Lee, supra,* 20 Cal.4th at p. 59.) '[T]he victim must taunt the defendant or otherwise initiate the provocation.' (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306; *People v. Manriquez* (2005) 37 Cal.4th 547, 583-584 (*Manriquez*).) The ' "heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances. . . ." ' (*People v. Steele* (2002) 27 Cal.4th 1230, 1252 (*Steele*).) '"[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter."' (*People v. Daniels* (1991) 52 Cal.3d 815, 868.)" (*People v. Avila* (2009) 46 Cal.4th 680, 705 (*Avila*).)

Although attempted voluntary manslaughter is a lesser included offense of attempted murder (*People v. Heffington* (1973) 32 Cal.App.3d 1, 11), the evidence at trial failed to show provocation by Delgado that could support an attempted voluntary manslaughter conviction. Although Quezada points out Delgado saw himself as a protector of his neighborhood, the record shows the Norteños arrived at the neighborhood with a plan for a drive-by shooting. The evidence showed Delgado was doing nothing more than talking to someone in front of his house when the defendants in this case suddenly opened fire on him. Delgado's conduct was not provocative.

We also reject Quezada's attempt to characterize the evidence as showing Delgado returned fire with a BB gun. First, the evidence showed Delgado got his BB gun only after the defendants' gunfire ended. Moreover, contrary to Quezada's assertion, the reason for the windshield crack is not clear from the record when it shows the same car was involved in a crash and served as the base from which three Norteños launched a hail of gunfire. The fact the window of the Chevrolet was shattered does not establish Delgado provoked the shooting.

22

Second, even if Delgado had returned fire, this would not constitute a provocative act that would have reduced the attempted murder to attempted voluntary manslaughter. The provocative act must precipitate, not respond to, the attempted homicide. (*Avila, supra,* 46 Cal.4th at p. 705) We conclude the trial court did not have a duty to give an attempted voluntary manslaughter instruction.

## V

### *Jury Instruction on Premeditation*

Reyes contends the trial court misinstructed the jury by failing to modify CALCRIM No. 600 to clarify that the mental state of one defendant could not be borrowed to convict another defendant of attempted murder. We conclude no jury would have been confused about the requisite mental state for attempted premeditated murder based on the instructions given.

### A.

### *Jury Instructions Given*

The trial court instructed the jury with CALCRIM No. 600, as follows: "The defendants are charged in Count 2 with attempted murder. [¶] To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance

23

outside the plan had not interrupted the attempt.  [¶]  A person who attempts to commit murder even if, after taking a direct step toward killing, he or she abandons further efforts to complete the crime, or his or her attempt fails or is interrupted by someone or something beyond his or her control.  On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing the murder, then that person is not guilty of attempted murder.  [¶]  The defendant may be guilty of attempted murder even if you conclude that murder was actually completed."

In considering the claim of instructional error, we do not view the instructions in isolation.  "'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' "  (*People v. Bolin* (1998) 18 Cal.4th 297, 328, quoting *People v. Burgener* (1986) 41 Cal.3d 505, 538-539.)  Thus, we note the jury was further instructed with CALCRIM No. 401, in pertinent part, as follows:  "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that  [¶]  1.  The perpetrator committed the crime;  [¶]  2.  The defendant knew that the perpetrator intended to commit the crime;  [¶]  AND  [¶]  4.  The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.  [¶]  Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

## B.

### *Attempted Premeditated Murder*

Attempted murder requires both an intent to kill and a direct but ineffectual step toward accomplishing the intended killing.  (*People v. Smith* (2005) 37 Cal.4th 733, 739

24

(*Smith*).) Unless the defendant specifically contemplated taking life, his or her actions cannot support an attempted murder conviction. (*People v. Swain* (1996) 12 Cal.4th 593, 604.) Intent to kill, unaccompanied by any action, does not constitute a crime. Intent to kill accompanied by action that reaches its goal amounts to murder. (§ 187.) Thus, intent to kill supports an attempted murder conviction if it is accompanied by some action toward taking a life that falls short of the goal. (See *Smith, supra*, 37 Cal.4th at pp. 739-740.)

The manner in which a killing has been committed has often supported an inference the taking of a life was accompanied by an intent to kill. (E.g., *Smith, supra,* 37 Cal.4th at pp. 741-742 [holding that even in the absence of motive, shooting at close range supports inference of express malice].) Thus, certain manners of action provide circumstantial evidence of express malice -- sometimes overwhelming evidence of intent to kill. (E.g., *People v. Hawkins* (1995) 10 Cal.4th 920, 956-957 [victim shot while kneeling or crouching and at close range in head and neck allowed for inference of "execution-style murder"], disapproved on another point in *People v. Lasko* (2000) 23 Cal.4th 101, 110.) Whether the evidence proved an intent to kill constitutes a factual question that a criminal defendant has the right to have the jury answer. (See *Smith, supra,* 37 Cal.4th at p. 740 [holding the jury was properly instructed on elements of attempted murder, including requirement that defendant had be found to have had an intent to kill].)

## C.

### *The Jury Instructions on Intent to Commit Attempted Murder*

Although CALCRIM No. 600 starts by noting multiple "defendants" were charged with attempted premeditated murder, the remainder of the instruction refers to "defendant" in the singular form. We reject Reyes's contention that repeated use of the

25

singular noun "defendant" in CALCRIM No. 600 allowed the jury to rely on the premeditation of another defendant to satisfy the mental element of attempted premeditated murder for him. The only plausible reading of CALCRIM No. 600 is the defendant being considered on the charge of attempted premeditated murder must himself or herself have "intended to kill that person." Nothing in CALCRIM No. 600 suggested the mental state of one defendant may be imputed to *another* defendant. The consistent use of the singular form "defendant" required the jury to apply the whole of the instruction to each defendant being considered.

Even if CALCRIM No. 600 somehow allowed the borrowing of the mental state of another defendant to satisfy the mens rea for attempted premeditated murder, CALCRIM No. 401 would have cured the error by properly instructing on aiding and abetting. The aiding and abetting instruction informed the jury that even if a defendant is not a principal the defendant is still guilty of an offense if he or she "specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." Thus, CALCRIM No. 401 prevented any improper borrowing of a mental state from another defendant.

In short, CALCRIM No. 600 properly instructed the jury Reyes could be found guilty of attempted premeditated murder only if he had the requisite mental state. Even if Reyes had somehow not been considered a principal, the jury had CALCRIM No. 401 to guide it in determining whether he had the requisite mental state to aid and abet the attempted premeditated murder. Taken together, the jury could not have convicted Reyes -- or any of the other defendants -- of attempted premeditated murder without first finding the defendant committed the offense with the required mental state.

26

DISPOSITION

The judgment is affirmed.

/s/
HOCH, J.

We concur:

/s/
NICHOLSON, Acting P. J.

/s/
MAURO, J.