Filed 1/3/24; Certified for Publication 4/10/23 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E082085 |
| v. | (Super.Ct.No. FSB20003711) |
| TYSHAWN MICHAEL LEWIS, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Alexander R. Martinez, Judge.  Reversed with directions.

Sally Patrone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

Penal Code section 1172.2 establishes the process for the Department of Corrections and Rehabilitation (the Department) to request compassionate release of an incarcerated person. (Unlabeled statutory references are to the Penal Code.) Section 1172.2 creates a presumption requiring the court to recall the sentence of an incarcerated person with certain qualifying medical conditions unless the court finds that the person poses an unreasonable risk of danger to public safety—defined as an unreasonable risk of committing certain violent felonies—"based on the incarcerated person's current physical and mental condition." (§ 1172.2, subd. (b) (§ 1172.2(b)).)

Tyshawn Michael Lewis appeals from the order denying the Department's petition to recall his sentence under section 1172.2. We conclude that the trial court abused its discretion because the dangerousness finding is not supported by any evidence. We accordingly reverse with directions to grant the petition.

BACKGROUND

A. *The Conviction and Sentence*

In 2022, a jury convicted Lewis of a first degree murder (§ 187, subd. (a)) that Lewis committed in 2020 by shooting the victim five or six times at close range. (*People v. Lewis* (Nov. 30, 2023, E079660) [nonpub. opn.].) "Lewis was identified as the shooter during the police investigation and at trial by an eyewitness who was standing next to [the victim] when he was shot." (*Ibid.*) The jury found true the allegations that Lewis personally used a firearm causing death (§ 12022.53, subds. (b)-(d)) and that he suffered a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

2

In August 2022, the court sentenced Lewis to 75 years to life in state prison. We affirmed the judgment. (*People v. Lewis*, *supra*, E079660.)

B. *Compassionate Release Petition*

In June 2023, Dr. Joseph Bick, the Department's director of Health Care Services, sent a letter to the court recommending that the court grant Lewis compassionate release and recall his sentence under section 1172.2. Attached to the letter and also submitted to the court were various documents, including (1) a May 2023 diagnostic study and evaluation report conducted by the Department for purposes of evaluating whether Lewis's sentence should be recalled, (2) a compassionate release request "chrono" dated April 21, 2023, and signed by two prison doctors, (3) the probation officer's report for the 2022 murder conviction, and (4) a report from the Department dated October 20, 2022, and entitled "Institutional Staff Recommendation Summary." (Some capitalization and boldfacing omitted.)

Dr. Bick notified the court that Lewis was 37 years old and had "a clear end of life trajectory." Lewis was diagnosed with amyotrophic lateral sclerosis (ALS), which was rapidly progressing. Dr. Bick described Lewis as having lost the ability to use his arms and having difficulty swallowing, breathing, and ambulating. Lewis required assistance with the daily activities of feeding, bathing, and dressing. The April 2023 chrono documented that Lewis was evaluated by doctors at a hospital's emergency room, where he received a neurologic consultation. Doctors recommended that Lewis be fed exclusively pureed food in order "to help decrease the risk of aspiration."

The May 2023 study was prepared and signed by a correctional counselor at the prison where Lewis was housed, and the study was signed by the warden. The study evaluated Lewis's "potential for success under sentence alternatives to State prison, and the threat posed to the community should the defendant not fulfill that potential." The study documented Lewis's criminal and institutional history (for his present and earlier commitments) and contained a medical evaluation and a postrelease plan. The summary of Lewis's medical condition was consistent with the information provided by Dr. Bick. Lewis's mother would be his primary caretaker if he were released.

The study did not include a recommendation about whether Lewis's sentence should be recalled, but it listed 10 "factors for consideration," including that Lewis (1) had a life expectancy of less than six months, (2) had "a history of affiliation with organized criminal activity," (3) had a criminal and institutional history of violence, and (4) "does retain the capacity to commit or to influence others to commit criminal acts that endanger public safety." (Capitalization and boldfacing omitted.)

The study noted that there was "documentation" that Lewis was "affiliated with a Security Threat Group, gang, or disruptive group Rolling 30' Crips." The probation officer's report for Lewis's 2022 conviction contains a one-page form that contains identifying information about Lewis and that states "Rollin 30's Crips" in a box entitled "gang information." (Capitalization omitted.) The probation officer's report identifies one of Lewis's tattoos as being "Harlem Crip." The institutional staff recommendation summary includes a section entitled "STG Affiliations." (Boldfacing omitted.) (We assume based on context that STG stands for "street gang.") That section describes

4

Lewis as a "Suspected" and "Active" "Associate" of the Rolling 30's, which is identified as a "Set" of the Crips. (Some boldfacing omitted.)

As to Lewis's criminal history, he was adjudged a delinquent in 2002 for committing assault with a deadly weapon. (§ 245, subd. (a)(1).) As an adult, Lewis was convicted of the following crimes from 2005 through 2022: firearm possession offenses in 2005, 2009, and 2017 (§§ 12022, subd. (a)(1), 29800, subd. (a)(1); former § 12021, subd. (a)(1)); misdemeanor driving under the influence of alcohol or drugs in 2007 (Veh. Code, § 23152, subd. (a)); battery by a prisoner on a nonconfined person in 2010 (§ 4501.5); burglary in 2010 (§ 459); and first degree murder in 2022 (§ 187).[1] Lewis also violated parole multiple times. In 2005 and 2009, Lewis was charged but not convicted of firearm possession while an active participant in a criminal street gang, in violation of former section 12025, subdivision (b)(3), and former section 12031, subdivision (a)(2)(C). The disposition from those cases indicates that Lewis was convicted of other firearm possession offenses that did not include any element involving

---

[1] We take the facts concerning Lewis's criminal history from the 2022 probation officer's report and the Department's May 2023 evaluation and study, but there are discrepancies between the documents. The study states that Lewis suffered several convictions that he apparently did not. First, the study states that Lewis was convicted of assault with the intent to commit murder in violation of former section 217. That statute was repealed in 1980, over five years before Lewis was born. Second, the study states that Lewis was convicted in 2017 of possession of a controlled substance with the intent to sell, in violation of Health and Safety Code section 11378. The probation officer's report confirms that Lewis was charged with that offense, but he was not convicted of it. Third, the study states that Lewis was convicted in 2011 of robbery in violation of section 211, but the probation officer's report does not include that conviction. It documents that Lewis was convicted of burglary (§ 459) in 2010.

active participation in a criminal street gang.  (§ 12022, subd. (a)(1); former § 12021, subd. (a)(1).)

During previous periods of institutionalization, Lewis had numerous rules violations, including for fighting, participating in a riot, failing to respond to notices, delaying a peace officer, disobeying orders, battery on a peace officer, and battery with a deadly weapon.  Lewis had "no write-ups" documented during his current term of imprisonment, which began in August 2022.

C.  *The Hearing*

The trial court conducted a hearing on the section 1172.2 petition in August 2023.  The parties stipulated that Lewis had been diagnosed with ALS.  The court found on the basis of that stipulation that Lewis had a qualifying medical illness under section 1172.2.

Dr. Michelle DiTomas testified by phone.  She confirmed that Lewis's ALS is "pretty rapidly progressive."  Lewis first experienced symptoms more than one year earlier, when he suddenly could not dribble a basketball.

Dr. DiTomas saw Lewis two weeks before the hearing and also the day before she testified.  Lewis was able to speak when last seen, but it was more difficult for Dr. DiTomas to understand him than during her earlier visit.  Lewis's speech was "a bit garbled" at the last visit.  Dr. DiTomas did not completely understand him and had to ask him to repeat himself.  Lewis spoke on the phone with his family every day, with staff holding the phone to his ear.  Nurses reported that Lewis had started struggling to communicate on the phone "because of [the] garbled nature of his speech at this time."

6

Dr. DiTomas believed that it was "very likely" that Lewis would not be able to speak within one month "or so" as a result of "extensive tongue weakness." The muscle in Lewis's tongue had atrophied. Lewis's ability to swallow had progressively worsened, so that he is at "very high risk for aspiration."

Dr. DiTomas testified that Lewis is dependent on medical staff to "do everything for him." Lewis requires assistance in eating, showering, and using the bathroom. He is able to walk short distances but experiences some weakness in his legs. Because of the lost functionality of his arms, Lewis is "very unsteady" walking, so he occasionally falls. He fell the week before the hearing. Staff transport Lewis to appointments by wheelchair. Given the rapid progressivity of the disease and Lewis's weakness, Dr. DiTomas opined: "[T]here's just no way [Lewis] could cause harm to somebody. You just have to push him a little bit, and he's going to fall over. There's no way for him to protect himself."

As to Lewis's prognosis, Dr. DiTomas stated: She "would not be surprised if he died in the next six months. And [she] would be surprised if he lived a year." Dr. DiTomas observed that during the couple of months that Lewis had been in her unit he had "been incredibly respectful, appreciative of care," and the staff supported him. She believed the ALS diagnosis had been profound for Lewis.

D. *The Ruling*

The trial court denied the petition, concluding that Lewis "does indeed pose an unreasonable risk of danger to public safety, even assuming that [his] current physical condition is medically true." The court specified that it believed that Lewis posed an

unreasonable risk of "danger of committing a violent super strike felony in the future pursuant to" section 667, subdivision (e)(2)(C). The court explained that it believed that Lewis posed such a risk "not only based on the facts of the present case and [his] criminal history, but most importantly it is also based on the explicit findings by the authors of the diagnostic study and evaluation report that was included in the petition packet submitted to this court for review."

The court elaborated that it was relying in particular on the study's assertion that Lewis "does retain the capacity to commit or to influence others to commit criminal acts that endanger public safety." The court reasoned that Dr. DiTomas's testimony did not contradict that assertion because she confirmed that Lewis remained able to talk. The court explained that "the capacity to commit crime and violent super strike[s] such as solicitation to commit murder does not require somebody to physically do that act. It can be coordination, speaking, talking to somebody, aiding and abetting, helping to coordinate, plan, strategize, telephonic contacts, speaking with somebody about it." The court noted that the assertion about Lewis's retained ability to commit crime distinguished Lewis's circumstances from those of the incarcerated person in *People v. Torres* (2020) 48 Cal.App.5th 550 (*Torres*), in which this court reversed the trial court's denial of a motion for compassionate release under then-existing law (*id.* at pp. 552-553).

In addition to relying on the study's assertion that Lewis retained the ability to commit crimes, the trial court found that the brutality and unjustified nature of the 2022 first degree murder along with Lewis's lack of remorse for the crime also showed that he posed an unreasonable risk of committing a super strike. The court additionally found

8

that Lewis's "extensive violent, criminal history similarly supports this court's finding that [he] poses an unreasonable risk of danger to public safety." The court chronicled each of Lewis's convictions, including the alleged convictions in 2017 for possessing controlled substances for sale and in 2005 and 2009 "for being a gang member in possession of a gun." The court also noted that the study and institutional staff summary "repeatedly state that the defendant is still an active associate of the Rolling 30 Crips criminal street gang."

The court found that Lewis's criminal history and his "current association with a violent criminal street gang make him an unreasonable risk of committing, attempting to commit or soliciting another murder in the future." The court explained that given Lewis's "still active associations with [a] criminal street gang he would still have the ability to speak easily on the phone with members of that gang to coordinate and strategize further criminal activity, particularly violent criminal activity such as solicitation to commit murder."

The court concluded: Given Lewis's "violent criminal history and still ongoing current association with violent criminal street gang, that in this court's view makes him still an unreasonable risk of danger to public safety. So therefore, given the conclusion by the authors of that report that he does retain the capacity to commit or to influence others to commit criminal acts that endanger public safety, that conclusion combined with the fact that the defendant is currently serving a sentence for murder and his prior violent criminal history and his current ongoing association with a violent criminal street gang, all of those in this court's view support this court's explicit finding that the

9

defendant does indeed pose an unreasonable risk of danger to public safety. And therefore, his petition for compassionate release is denied."

DISCUSSION

Lewis argues that the trial court abused its discretion by finding that he posed an unreasonable risk of danger to public safety by committing a super strike offense, because the finding is not supported by substantial evidence. We agree.

Section 1172.2 authorizes a court to recall the sentence of an incarcerated person with "a serious and advanced illness with an end-of-life trajectory," including ALS. (§ 1172.2, subd. (b)(1).) Section 1172.2(b) provides: "There shall be a presumption favoring recall and resentencing under this section if the court finds that [the incarcerated person suffers from a qualifying illness], which may only be overcome if a court finds the defendant is an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18, based on the incarcerated person's current physical and mental condition." Section 1170.18, subdivision (c), defines an "'unreasonable risk of danger to public safety'" as meaning "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of" subdivision (e)(2)(C)(iv) of section 667. The eight felonies listed in that provision are referred to "as 'super strikes'" (*People v. Valencia* (2017) 3 Cal.5th 347, 351) and include any homicide offense, any attempted homicide offense, solicitation to commit murder, and any violent or serious felony offense punishable by death or life imprisonment (§ 667, subd. (e)(2)(C)(iv)(IV), (V), & (VIII); *Valencia*, *supra*, at p. 351, fn. 3).

10

We review for abuse of discretion the trial court's determination that a petitioner poses an unreasonable risk of danger to public safety. (*Nijmeddin v. Superior Court* (2023) 90 Cal.App.5th 77, 83 (*Nijmeddin*).) "A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.) We review the trial court's factual findings for substantial evidence. (*In re White* (2020) 9 Cal.5th 455, 470.)

None of the evidence relied on by the trial court supports its finding that Lewis posed an unreasonable risk of committing a super strike based on his present physical and mental condition. The court's reliance on the statement in the study that Lewis "does retain the capacity to commit or to influence others to commit criminal acts that endanger public safety" is misplaced. That assertion means only that Lewis has the present ability to commit or to influence others to commit unspecified criminal acts. Even assuming that "criminal acts that endanger public safety" encompasses the relevant super strike offenses, Lewis's mere ability to commit a super strike offense is not by itself probative of whether Lewis poses any risk—let alone an unreasonable risk—of committing such an offense. The study's assertion amounts to nothing more than "a generalized concern about [Lewis's] 'ability to continue to commit crimes.'" (*Nijmeddin*, *supra*, 90 Cal.App.5th at p. 83.)

We agree with the trial court's assessment that Lewis's physical limitations notwithstanding, Lewis's ability to speak made it possible for him to commit a super strike offense. By speaking, Lewis could solicit or aid and abet a homicide offense or an attempted homicide offense. (§ 667, subd. (e)(2)(C)(iv)(IV)-(V).) However, Lewis's

11

mere capacity to engage in such conduct has no tendency to prove that it is likely, let alone that there is an unreasonable risk, that he will actually engage in such conduct. The record contains no evidence that Lewis has ever solicited or directed anyone to commit any crime. The record does not even contain evidence that Lewis has ever acted in concert with anyone in the commission of any crime. In the absence of such evidence, the evidence that Lewis retains some ability to speak has no tendency to prove that there is an unreasonable risk that he will commit a super strike by soliciting or aiding and abetting homicide or attempted homicide.

That deficiency in the evidence is not remedied by the circumstances of Lewis's most recent offense, his lack of remorse, or his criminal history. Lewis has convictions for firearm possession, driving under the influence, battery, burglary, and murder. His disciplinary history also shows that during previous periods of incarceration he had numerous rules violations. But again, there is no evidence that he has ever solicited or directed anyone to commit any crime (or to commit any rule violation while incarcerated) or even acted in concert with anyone in committing any crime. If Lewis is released, it is possible that for the first time in his life he will use his ability to speak to solicit or aid and abet a homicide or attempted homicide. But the same bare possibility exists for anyone who has any ability to communicate. Lewis's criminal and disciplinary history does not reveal any prior tendency to engage in such conduct, so it cannot support a reasonable inference that he poses an unreasonable risk of engaging in such conduct in the future. Again, the evidence supports nothing more than "a generalized concern about

12

[Lewis's] 'ability to continue to commit crimes.'" (*Nijmeddin*, *supra*, 90 Cal.App.5th at p. 83.)

For several reasons, the evidence concerning Lewis's gang affiliation likewise does not support the court's finding that Lewis poses an unreasonable risk of committing a super strike if released. First, the evidence of Lewis's gang involvement is considerably more ambiguous than the trial court's description suggests. Contrary to the trial court's statements, Lewis has never been convicted of any gang-related offense or been the subject of a gang-related enhancement allegation that was found true. Moreover, the evidence describes the "Validation Status" of Lewis's gang involvement as merely "Suspected," and it describes his "Affiliation Level" as "Associate" (some boldfacing omitted) but does not clarify whether that means he is a (suspected) gang *member* or has a (suspected) looser affiliation with the gang. (See *People v. Huynh* (2021) 65 Cal.App.5th 969, 976 [describing the distinction between a "gang member" and a mere "associate" of a gang].) Second, there is no evidence that Lewis has a sufficiently elevated status in any gang to be able to direct other gang members to commit crimes. (See *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1446 [describing "a gang hierarchy starting at the bottom with associates and topping out at original gangster" or "'shot caller'" status].) Third, the record contains no evidence that Lewis has ever solicited, directed, aided and abetted, or acted in concert with any gang members or affiliates to commit any crime. Nor does the record contain any evidence that Lewis has ever made use of his suspected gang connections (whatever they might be) to solicit, direct, aid and abet, or act in concert with anyone else to commit any crime. For all of

13

these reasons, the evidence that Lewis is suspected of some degree of involvement with a gang has no tendency to show that, despite his present physical condition, there is an unreasonable risk that Lewis would commit a super strike if released.

Finally, we note that the trial court's reliance on *Torres*, *supra*, 48 Cal.App.5th 550, was misplaced. *Torres* is no longer good law, because it has been superseded by statutory amendment. When *Torres* was decided, the compassionate release statute made relief discretionary even if the defendant met the eligibility criteria. (*Id.* at p. 560.) But under the current statute, relief is mandatory unless the defendant poses an unreasonable risk of committing a super strike. (§§ 1172.2(b), 1170.18, subd. (c).) In addition, although the evidence in *Torres* indicated that the defendant lacked the capacity to commit additional crimes (*Torres*, at p. 553) and the study concerning Lewis states that he has that capacity, that distinction is inadequate to support the trial court's ruling. As already explained, Lewis's *mere capacity* to commit (or to induce others to commit) a super strike does not show that there is an *unreasonable risk* that Lewis will engage in such conduct. (*Nijmeddin*, *supra*, 90 Cal.App.5th at p. 83.)

For all of the foregoing reasons, we conclude that there is no evidence supporting the finding that Lewis poses an unreasonable risk of committing a super strike. We accordingly conclude that the trial court abused its discretion by finding to the contrary. Because there is no evidence that Lewis poses an unreasonable risk of endangering public safety by committing a super strike offense, section 1172.2(b) mandates that Lewis's sentence be recalled. We accordingly reverse the trial court's order denying the section 1172.2 petition and direct the court to grant the petition.

14

Lewis asks that we immediately issue the remittitur.  We are empowered to "direct immediate issuance of a remittitur only on the parties' stipulation or on dismissal of the appeal under rule 8.244(c)(2)" of the California Rules of Court.  (Cal. Rules of Court, rule 8.272(c)(1).)  Before oral argument, we issued a tentative opinion that proposed to reverse with directions to grant the petition for compassionate release.  At oral argument, the People agreed to the immediate issuance of a remittitur if our tentative opinion became the final opinion of the court.  Because the tentative opinion has now become the final opinion, we accept the parties' stipulation and direct that the remittitur issue immediately.

## DISPOSITION

We reverse the August 18, 2023, order denying the petition to recall Lewis's sentence under section 1172.2 and direct the trial court to grant the petition and to recall Lewis's sentence.  The remittitur shall issue immediately pursuant to the parties' stipulation.  (Cal. Rules of Court, rule 8.272(c)(1).)

MENETREZ
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

15

Filed 4/10/24

Court of Appeal, Fourth Appellate District, Division Two - No. E082085

**S283542**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

THE PEOPLE, Plaintiff and Respondent,

v.

TYSHAWN MICHAEL LEWIS, Defendant and Appellant.

_____

As recommended by the Court of Appeal, the Reporter of Decisions is directed to publish the Court of Appeal opinion in the above-entitled matter in the Official Reports. (Cal. Rules of Court, rule 8.1120(a)(1).)


_____
*Chief Justice*