Filed 10/25/24  P. v. Dominguez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C099734 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F05226) |
| v. | |
| GABRIEL RICARDO DOMINGUEZ, | |
| Defendant and Appellant. | |

Defendant Gabriel Ricardo Dominguez appeals from an order denying his petition for resentencing under Penal Code section 1172.6[1] (formerly § 1170.95). Following an evidentiary hearing, the trial court found defendant guilty of implied malice murder because he actively and intentionally aided and abetted an armed group assault on a defenseless victim.

---

[1]     Undesignated section references are to the Penal Code. Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.)

1

On appeal, defendant contends the trial court misunderstood what was required to find him guilty of aiding and abetting an implied malice murder.  Had the court applied the correct legal standard, defendant argues, there would have been insufficient evidence to find him guilty of implied malice murder.  In the alternative, defendant argues this matter should be remanded for a new evidentiary hearing because the trial court failed to adequately consider how youth impacted his ability to form the requisite mental state for implied malice murder.  Finally, defendant raises multiple claims of ineffective assistance of counsel, which he contends were individually or cumulatively prejudicial.  We affirm.

BACKGROUND FACTS AND PROCEDURE

Defendant's brother, Leonardo Chavez (Chavez), a gang member, got into a fight at a liquor store with three men, at least one of whom was believed to be a member of a rival gang.  After receiving a call from Chavez's girlfriend, a group of people drove to the liquor store and joined the fight.  Defendant followed shortly thereafter on foot.  The arriving group attacked the men who "jumped" Chavez and, after singling one out, viciously beat and stabbed him multiple times.  Near the end of the fight, witnesses saw defendant deliver five or six quick blows to the back of the victim's head and neck.  The victim later died from multiple stab wounds.

Defendant was charged with first degree murder for his role in the killing.  At defendant's trial, numerous witnesses appeared and testified.  We describe the pertinent testimony below, focusing on the evidence most germane to the issues raised on appeal.

A.      *Witness Testimony*

1.      *The Victim's Friends*

On May 1, 2009, Brian Logan (Logan), Nathaniel Renteria (Renteria), and Samuel Sanchez (the victim), went to a liquor store to rent a U-Haul truck.  Logan was wearing a red and black shirt and red and black shoes, and the victim Sanchez was wearing a red jersey.  Renteria is or was affiliated with the Northern California (Norteños), a Hispanic street gang associated with the color red.

2

Chavez, a Southern California (Sureño) gang member, went inside the liquor store and exchanged words with Renteria. Then the men went outside and began fighting. Outnumbered three to one, Chavez told his girlfriend to "call the homies." Minutes later, a white sport utility vehicle (SUV) pulled up, and "five or six [persons], maybe more," jumped out of the SUV and "started charging at everybody."

One of the men who exited the SUV had a small knife and another had a crowbar or pry bar.[2] During the fight, Logan was stabbed with a pocketknife and Renteria was stabbed with a "chisel" (or pry bar). As people were running around, Renteria heard people shouting, "[Y]ou buster, we're gonna kill you."[3]

At some point during the fight, Renteria saw a man with a chisel swinging it "[f]ull throttle" and striking the victim in the back. Renteria ran up to the man with the chisel and hit him in the face. The man dropped the chisel and someone else picked it up. Renteria then went to look for Logan. The next time Renteria saw the victim, there were five or six men on top of him. The men were kicking, stomping, and stabbing him. Renteria testified that he could see "knives" as a "couple people" were "stabbing at [the victim]." Renteria also saw the victim being hit with a chisel.

At trial, Logan did not recall seeing the victim stabbed. However, Logan recalled telling the police that he had seen a tall, skinny man with "longer hair" and a "mustache"—i.e., not defendant—stabbing or making a "stabbing motion" at the victim.

After the fight, Logan and Renteria helped the victim to their car and drove him to the hospital. The victim was covered in blood, with "gashes," "hits," and "blood drizzling everywhere."

---

[2]    Renteria told police detectives that the man holding the knife was a male Hispanic, about five feet, six inches tall, with black combed-back hair. Defendant, who had a shaved head, did not match that description.

[3]    "Buster" is a derogatory term Sureño gang members use to offend Norteño gang members, suggesting to Renteria that the men in the group were part of a gang.

## 2. *Neutral Witnesses*[4]

Mike P. was standing outside a restaurant with his friends, Frank S. and Chris H., when he noticed a group of people fighting across the street. Shortly thereafter, a white SUV pulled into the parking lot and three or four people jumped out of the vehicle and joined the fight. One of those individuals was holding a crowbar. Mike P. testified that he did not see any knives, chisels, or other weapons in the hands of the individuals as they got out of the SUV.[5]

After the SUV arrived, Mike P. estimated there were ten or more individuals involved in the fight. Mike P. believed it was a gang fight based on the colors (red and blue/white T-shirts) that some of the individuals were wearing. The people who jumped out of the SUV joined the "blue" side, which outnumbered the people on the "red" side. Mike P. described the fighting as people running around, getting chased, and throwing punches. He did not see the person with the crowbar use it during the fight.

As the fighting continued, a Hispanic male dressed in a white T-shirt and blue jeans—later identified as defendant—approached on foot, arriving from the same direction as the SUV. Defendant yelled something at Mike P., who happened to be dressed in red. Mike P. did not respond and retreated toward the restaurant.

When Mike P. looked back at the fight, he saw the victim on the ground surrounded by five or six people, including defendant. The victim was in the fetal position with his hands covering his head, and the people around him were kicking, punching, and stomping him. As the attackers started to back off, defendant delivered five or six quick, hammer-style blows to the back of the victim's head and neck. Mike P.

---

[4]     To protect their privacy, we refer to the witnesses by first name and last initial or initials. (Cal. Rules of Court, rule 8.90 (b)(10).)

[5]     Mike P. did not recall telling detectives that the people in the group were running around with knives but did recall telling them they had crowbars.

testified that the blows did not appear forceful, and he could not see anything in defendant's hands. After defendant's blows to the victim, everyone scattered, and the victim got up and went toward the liquor store. Mike P. and his friends left the scene.

Between the date of the incident and his police interview, Mike P. learned the victim had been stabbed and killed. Mike P. told detectives that defendant "could have been" the one who did the stabbing.

Frank S.'s and Chris H.'s testimony was similar to Mike P.'s. They testified that the fight was imbalanced and, as it progressed, the victim ended up on the ground with about five or six people hitting and kicking him. Chris H. testified that he did not see any knives or other weapons in the hands of the attackers except that he may have seen one man with a crowbar. Frank S. testified that one person in the SUV group had a crowbar but he did not see it used. Frank S. did not see anyone with knives. However, he told detectives that "they could have had knives by the way they were swinging. . . . [T]hey weren't normal punches . . . [He] could see 'em flailing–flailing their arms . . . ." At some point, as the large group backed off and walked away, Frank S. saw a male approach the victim and deliver seven or eight fast blows to the victim's upper back.

N.M. was working as a cashier at the liquor store when he saw two or three men "jump" Chavez. During the ensuing fight, a white SUV pulled up in front of the store and two or three males jumped out to help Chavez. One of the men was carrying a "metal bar" or something similar and hit the victim with it during the fight. N.M. identified defendant as a person involved in the fight.

3.      *Defendant's Friends and Family*

Chavez, the defendant's older brother, testified that his girlfriend drove him to the liquor store. When he went inside, a man (Renteria) whom Chavez believed to be

5

associated with the Norteños gave him dirty looks and they exchanged words.[6]  They then went outside and began to fight.  Chavez was outnumbered, so he told his girlfriend to call his brother.  Shortly thereafter, "a lot" of people showed up, although Chavez claimed he did not know or recognize anyone except for his brother, Francisco Dominguez,[7] who was holding a crowbar.  Chavez claimed that he never saw defendant at the fight.

Francisco testified that on the day of the incident, he was at an apartment with some friends when Chavez and his girlfriend left for the liquor store.  A few minutes later, he received a call that Chavez was "getting jumped."  Francisco immediately drove to the liquor store.  Francisco claimed to have "no idea" how many people were in his SUV.

Francisco testified that when he arrived at the fight, he initially got out of the SUV empty handed but went back and got a crowbar when he heard someone talking about a gun.  Francisco claimed that he tried to break up the fight and did not "swing" the crowbar; he only used it defensively.  Francisco claimed that he never saw defendant at the fight.

B.    *Forensic Evidence*

The forensic pathologist who performed the victim's autopsy testified that the victim died from stab wounds.  The pathologist found 11 stab wounds to the victim's neck, back, shoulders, and torso, all of which were inflicted with the same or similar instrument, a skinny double-edged blade or a very thin single-edged blade.  The victim

---

**6**    Renteria may have said, "What's up, ene?" which could be perceived as a challenge to a Sureño gang member.

**7**    Given the shared surname with the defendant, we will refer to this witness by his first name to avoid any confusion.  No disrespect is intended.

also suffered blunt force injuries consistent with being kicked, hit, and punched, but these were not cited as a cause of death.

C.    *Gang Evidence*

Sacramento Police Department Gang Detective Don Schumacher testified Sureños and Norteños are rival Hispanic street gangs. Detective Schumacher validated the victim as a Norteño and validated defendant and his brothers as Sureños. Detective Schumacher testified that "[r]espect is probably one of the most important themes for a gang member[,]" and that "[i]n the gang world, reputation or your respect typically equates to how much people fear you, how afraid they are of you." He further testified that one of the ways gang members garner respect is by committing violent crimes. If a gang member takes the life of a rival, it is "a reputation booster" for both the gang and the person who commits the violent act. Thus, in a fight with rival gang members, they will do "whatever it takes to win, to come out of the altercation having been the victor." He also testified that, with gangs, things can escalate extremely quickly, from a verbal challenge to a physical fight to a stabbing or gunfight.

D.    *Defendant's Police Interview*

Defendant was interviewed by detectives after his arrest. A recording of defendant's interview was played for the jury. Defendant told detectives that he was in the bathroom when everyone left, and by the time he arrived at the fight, everyone was already leaving so he "just went back."

Defendant believed the fight was gang-related and he admitted that he saw Francisco trying to scare people off with some type of metal bar. Defendant also admitted that, when he saw Chavez getting hit by someone, he ran "up over there and socked the fool a couple of times." But defendant claimed that he then got scared by a

7

man with a machete and ran away.[8]  Defendant claimed not to know anyone at the fight other than his brothers and one other person named "Alberto."  Defendant said "Alberto" was the one driving the white SUV and was "actually the innocent one there."

E.    *Defense Evidence*

The defense offered an experimental psychology professor as an expert witness on memory and perception.  He testified about general difficulties regarding the accuracy of recall and memory.

F.    *Verdict and Sentencing*

Defendant was charged with first degree murder.[9]  The information alleged that defendant committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and that defendant personally used a deadly and dangerous weapon (to wit, a knife) (§ 12022, subd. (b)(1)).

At trial, "[t]he jury was instructed as to the murder on theories of both deliberation and premeditation and aiding and abetting battery or assault with murder as the natural and probable consequence.  [¶]  In closing argument, the People offered both theories to the jury.  The defense argued the prosecution offered the aiding and abetting theory because it could not prove defendant was the actual killer.  The defense argued that all defendant did was go to the fight, see someone punch his brother, punch the man who punched his brother, and leave.  'He's not aiding and abetting anybody else, he is punching a guy.'  The defense focused on the varying descriptions of the stabber." (*People v. Dominguez* (June 27, 2012, C065762) [nonpub. opn.] (*Dominguez*).)

---

[8]    Renteria testified that a homeless/unhoused man with a machete had tried to stop the fighting.

[9]    Defendant was also charged and found guilty of an unrelated concealed firearm offense, which is not relevant to this appeal.

In June 2010, the jury found defendant guilty of first degree murder. (*Dominguez, supra*, C065762.) The jury deadlocked on the gang enhancement and the enhancement for personal use of a knife. (*Ibid.*) The trial court declared a mistrial on the enhancements and dismissed them in the interest of justice. (*Ibid.*) The trial court sentenced defendant to 25 years to life in state prison. (*Ibid.*) We affirmed the conviction and sentence on direct appeal. (*Ibid.*)

G.   *Petition for Resentencing*

In 2019, defendant filed a petition for resentencing under former section 1170.95 (now § 1172.6). (*People v. Dominguez* (Feb. 18, 2022, C093175) [nonpub. opn.].) Following an evidentiary hearing, the trial court denied the petition. (*Ibid.*) Defendant appealed, contending that the trial court applied the wrong standard of proof. (*Ibid.*) We agreed, reversed the judgment, and remanded for a new hearing at which the People would bear the burden of "proving defendant ineligible for relief beyond a reasonable doubt." (*Ibid.*)

On remand, the parties filed multiple briefs. The People's opening brief included as an exhibit a media disc containing three volumes of reporter's transcripts, one volume of clerk's transcript, and an augmented clerk's transcript from defendant's trial. After an evidentiary hearing, at which no new evidence was presented, the trial court denied the petition, finding "beyond a reasonable doubt that defendant is guilty of implied malice murder under a direct aiding and abetting theory." Defendant filed a timely notice of appeal.

DISCUSSION

I

*Aiding and Abetting Implied Malice Murder*

Defendant contends the trial court erroneously denied his resentencing petition because it applied an incorrect legal standard to find him guilty under a theory of directly aiding and abetting implied malice murder. We disagree.

9

A. *Senate Bill No. 1437*

"Under prior California law, a defendant who aided and abetted a crime, the natural and probable consequence of which was murder, could be convicted not only of the target crime but also of the resulting murder. [Citation.] This was true irrespective of whether the defendant harbored malice aforethought. Liability was imposed ' "for the criminal harms [the defendant] . . . naturally, probably, and foreseeably put in motion." ' " (*In re R.G.* (2019) 35 Cal.App.5th 141, 144.)

With the enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), the Legislature eliminated the natural and probable consequences theory of liability as a basis for a murder conviction. (Stats. 2018, ch. 1015, § 2; *People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*).) Now, to be convicted of murder, a principal must act with malice aforethought. (*In re R.G., supra*, 35 Cal.App.5th at p. 144.) Malice can no longer " 'be imputed to a person based solely on his or her participation in a crime.' " (*Ibid*.)

Senate Bill 1437 also added section 1172.6, creating a procedure for persons convicted under the former law, who could not be convicted under the law as amended, to retroactively seek relief. (*People v. Lewis* (2021) 11 Cal.5th 952, 957.) To obtain relief, the defendant must file a petition containing a declaration that shows all the requirements for eligibility are met, including that the petitioner could not presently be convicted of murder or attempted murder because of the changes made effective by Senate Bill 1437. (*People v. Wilson* (2023) 14 Cal.5th 839, 869; § 1172.6, subd. (a)(3).) If the petitioner makes a prima facie showing, the court must issue an order to show cause and hold an evidentiary hearing at which the prosecution bears the burden to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under the law as amended by Senate Bill 1437. (*Wilson, supra*, 14 Cal.5th at p. 869; § 1172.6, subds. (c) & (d).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be

10

vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

      B.     *Aiding and Abetting Implied Malice Murder*

Murder is "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  Malice may be express or implied.  (§ 188.)  The primary difference between express and implied malice is that "the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.)  "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes, supra*, 14 Cal.5th at p. 988.)

To find a defendant guilty of implied malice murder, the People must prove not only that the defendant committed an act that proximately caused the death of another person, but also that the defendant acted with implied malice.  (CALCRIM No. 520; *Zemek v. Superior Court of Riverside County* (2020) 44 Cal.App.5th 535, 552.)  Implied malice has both a physical (objective) component and a mental (subjective) component. (*People v. Carr* (2023) 90 Cal.App.5th 136, 141; *People v. Johns* (2020) 50 Cal.App.5th 46, 57; *People v. Knoller* (2007) 41 Cal.4th 139, 153.)  The physical component requires the performance of an act, the natural and probable consequences of which are dangerous to human life.[10]  (*Johns*, *supra*, 50 Cal.App.5th at p. 57.)  The mental component requires that the defendant know his/her conduct endangers human life and act with conscious disregard for life.  (*Ibid*.)

Notwithstanding the legislative changes effectuated by Senate Bill 1437, aiding and abetting implied malice murder remains a viable theory of murder liability.  (*Reyes,*

---

[10]    A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  (CALCRIM No. 520.)

*supra*, 14 Cal.5th at p. 990.) In *Reyes*, the California Supreme Court confirmed the elements of aiding and abetting an implied malice murder: " '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Id.* at pp. 990-991.)

C.    *Standard of Review*

Ordinarily, we review the trial court's factual findings for substantial evidence. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) But where, as here, there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law, which we review independently. (*Reyes, supra*, 14 Cal.5th at p. 988.)

D.    *Analysis*

In denying defendant's resentencing petition, the trial court defined the relevant life-endangering act as "several individuals, some of whom are armed, pummeling a victim who is in the fetal position and alone." Defendant contends this was in error because the evidence at trial established that the cause of death was the stab wounds to the victim's neck and torso. Defendant contends the trial court should have defined the life-endangering act as the fatal stabbings, and inquired whether defendant knew the participants in the fight possessed knives and intended to stab the victim. Applying that

standard, defendant contends there was no substantial evidence to support his conviction for murder.

The People respond that " '[T]here may be multiple proximate causes of a homicide, even where there is only one known actual or direct cause of death.' (*People v. Sanchez* (2001) 26 Cal.4th 834, 846.)" Thus, while the stabbings may have been the direct cause of death, the People contend the trial court correctly identified the armed group assault as an additional life-endangering act and proximate cause of death.

We agree with the People. As discussed, to be liable for an implied malice murder, the aider and abettor must, by words or conduct, aid in the commission of a perpetrator's life-endangering act. (*Reyes, supra*, 14 Cal.5th at p. 991.) As we stated in *People v. Powell* (2021) 63 Cal.App.5th 689, 713, footnote 27, a life-endangering act is an act "that proximately causes death." (*Reyes,* at p. 991 [citing *Powell* with approval]; *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 588, 600.)

A proximate cause of death is " ' "an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur." ' " (*People v. Carney* (2023) 14 Cal.5th 1130, 1138; *Zemek v. Superior Court of Riverside County, supra*, 44 Cal.App.5th at p. 552.) To be considered a proximate cause of the victim's death, the perpetrator's life-endangering act must have been " ' "a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*Reyes, supra*, 14 Cal.5th at p. 988.) Acts that merely create a dangerous situation in which death is possible do not satisfy this causation requirement. (*Id.* at p. 989.) The physical component of implied malice requires that the natural and probable consequences of the act be "dangerous to life," i.e., entail a significant risk of death. (*People v. Knoller, supra*, 41 Cal.4th at p. 157; *People v. Superior Court of San Diego County (Valenzuela)* (2021) 73 Cal.App.5th 485, 501 (*Valenzuela*); *People v. Clem* (2000) 78 Cal.App.4th 346, 349.)

13

In *Reyes*, the court held that the defendant's act of chasing a car into a rival gang's territory with fellow gang members, one of whom was armed with a handgun, was not a life-endangering act. (*Reyes, supra*, 14 Cal.5th at pp. 988-989.) Although it "may have been likely" that the act would result in a gang confrontation, with the possibility that someone would get hurt or killed, the act did not "give rise to a high degree of probability" that death would result. (*Id*. at p. 989.) It therefore did not satisfy the actus reus element of implied malice murder. (*Id*. at p. 990.)

But the facts here are materially different than *Reyes*. The perpetrators did not merely bring a dangerous weapon to a potential gang confrontation; they engaged in a violent group beating of a defenseless victim in retaliation for a perceived rival gang member's attack on defendant's brother. And it was not a simple fistfight. Some of the perpetrators were visibly armed with weapons, "ranging from crowbars and club-like sticks to chisels and knives," and at least one witness saw members of the attacking group stab the victim. There also was testimony that the confrontation was gang-related and that one of the ways gang members garner respect is by committing violent crimes. Under the circumstances, it was reasonable for the trial court to conclude that the violent beating of the victim by a group of individuals, some of whom were visibly armed with dangerous weapons, was a life-endangering act that proximately caused the victim's death.

We draw support for our conclusion from cases finding that violent assaults involving the use of dangerous weapons were life-endangering acts. (*People v. Schell* (2022) 84 Cal.App.5th 437, 443 [violent attack involving the use of dangerous weapons]; *People v. Didyavong* (2023) 90 Cal.App.5th 85, 99, review granted June 28, 2023, S279622, review dismissed Oct. 18, 2023 [same]; *People v. Brothers* (2015) 236 Cal.App.4th 24, 34-35 [deadly assault with a dangerous weapon]; *Valenzuela, supra*, 73 Cal.App.5th at p. 501 [armed melee]; *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1450 [reasonable to conclude that an attack by six gang members wielding a baseball bat

14

upon rival gang members could escalate into a fatal confrontation]; see also *People v. McNally* (2015) 236 Cal.App.4th 1419, 1425 [brandishing a loaded firearm]; *People v. Guillen* (2014) 227 Cal.App.4th 934, 944, 985-986 [group assault of a child molester]; *People v. Palomar* (2020) 44 Cal.App.5th 969, 976-977 [violent punch to an impaired and vulnerable victim].)

We do not agree that the trial court's approach was a backdoor means to apply the natural and probable consequences doctrine. As the Fourth Appellate District explained in *Valenzuela, supra*, 73 Cal.App.5th at page 503, "[e]ven if the requisite act were the same, the required mental state is significantly different." To impose liability on an aider and abettor for implied malice murder, the prosecution was required to prove that the aider and abettor was *subjectively aware* that the perpetrator's act involved a significant risk of death and that defendant acted in conscious disregard thereof. (*Ibid*.)

In light of our determination that the trial court did not misunderstand or misapply the law, we need not address defendant's claim that there would not be substantial evidence to support a conviction if the only life-endangering act was the stabbing.

II

*Consideration of Defendant's Youth*

Relying on *People v. Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*), defendant alternatively argues that this matter should be remanded for a new evidentiary hearing so the trial court can consider how defendant's youth impacted his ability to form the requisite mental state for implied malice murder.

We agree with the People that defendant forfeited this issue by failing to raise it below. (*Sander v. Superior Court of San Francisco City and County* (2018) 26 Cal.App.5th 651, 670; *People v. Saunders* (1993) 5 Cal.4th 580, 590.) Although *Pittman* was decided four days after the trial court denied defendant's petition, we are not convinced this excuses defendant's failure to raise the issue at his 2023 evidentiary hearing. Since 2021, appellate courts have concluded "nearly uniformly" that youth is a

15

relevant factor in determining whether a defendant acted with reckless indifference to human life under a felony-murder theory. (*Pittman, supra*, 96 Cal.App.5th at pp. 416-417.) Because the mental state required for implied malice murder—conscious disregard for human life—is so strikingly similar, (see *People v. Clark* (2016) 63 Cal.4th 522, 617), we are persuaded that defendant had a sufficient basis to raise the issue as part of his resentencing petition. (*Pittman,* at p. 416 [finding no forfeiture because the petition was denied in 2020 when "the relevant appellate cases" were decided in 2021 through 2023]; see *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 [finding no forfeiture because a court decision was foreseeable].)

In any event, the record shows that the trial court considered defendant's youth in its consideration of mens rea: "[T]he [c]ourt finds that defendant, who is 18 years old at the time of the incident . . . would know that a group of individuals, some of whom are armed, beating one person mercilessly, would be dangerous to human life. The [c]ourt has not received, nor is aware of, information that would cause it to question whether defendant's age or facilities would impair his ability to appreciate the danger the victim faced once the beating began." We presume from this finding that the court was aware of the cases concluding that youth is a relevant factor bearing on the mental state in section 1172.6 petitions. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) Defendant has not rebutted this presumption or made any showing that remand would be anything more than an idle act. Accordingly, even if defendant had not forfeited the issue, we would deny his request for a remand.

### III

### *Ineffective Assistance of Counsel*

Defendant also argues that reversal is required due to the cumulative effect of repeated occurrences of ineffective assistance of counsel. We conclude that either there was no error or that any purported errors were individually and collectively harmless.

A.    *Legal Principles*

To prevail on a claim of ineffective assistance of counsel,[11] defendant must prove: (1) trial counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.  (*People v. Johnson* (2015) 60 Cal.4th 966, 979-980.)  If the defendant fails to make a sufficient showing on either component, the claim must fail.  (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1158.)

There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.) " 'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*Ibid.*)

B.    *Analysis*

Defendant complains that counsel was deficient because he, (1) demonstrated fundamental misconceptions about the applicable standard of proof and what evidence may be considered, (2) argued irrelevant theories of guilt, (3) failed to highlight the evidence favorable to defendant's position, (4) failed to raise the issue of defendant's youth when discussing the mental state required for implied malice murder, (5) did not grasp how *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) was relevant to the gang expert's testimony, (6) did not keep abreast of the law and present relevant caselaw in a timely and effective manner, and (7) filed a confusing notice of appeal that reflects a misunderstanding of what the trial court found.  We shall consider these claims

---

[11]    The People concede, and we will assume, that, in light of the statutory right to counsel (§ 1172.6, subd. (d)(3)), defendant has a right to effective assistance of counsel.

17

individually and then consider whether the effect of the purported errors (if any) were cumulatively prejudicial.

### 1.     *Standard of Proof*

Defendant's chief complaint is that counsel's briefing reflected a fundamental misconception about the standard of proof.  Instead of recognizing that the prosecution bore the burden of proof beyond a reasonable doubt, defense counsel cited the substantial evidence standard of review.  Defendant claims counsel then compounded this error by failing to highlight evidence favorable to defendant, asking the trial court to conduct an independent review of the record, arguing irrelevant theories of guilt, and demonstrating confusion about what evidence could be considered by the court.

We agree with defendant that counsel initially appeared to be confused about the relevant standard of proof.  However, this was not prejudicial.  As defendant acknowledges, the prosecution pointed out counsel's (apparent) confusion and clarified the applicable standard.  In the end, defense counsel argued there was not sufficient proof beyond a reasonable doubt that defendant aided and abetted implied malice murder.  And the trial court clearly applied the correct burden of proof to the prosecution's theory of guilt.

The same is true regarding any confusion about whether the trial court could consider (non-hearsay) evidence from the preliminary hearing.  Defense counsel ultimately acknowledged the evidence could be considered and argued about its weight, value, and effect on the prosecution's burden of proof.

Regarding the recitation of facts, both the defense and prosecution briefs gave a detailed summary of the relevant testimony, and the trial court expressly stated that it considered the trial transcripts and the (non-hearsay) evidence from the preliminary hearing.  In fact, the trial court stated that it "read the trial transcript several times." Thus, even though we agree defense counsel could have done a better job of presenting the facts in a light more favorable to defendant, we are not persuaded that counsel's

performance was deficient (*People v. Ledesma* (2006) 39 Cal.4th 641, 748 [mere circumstance that a different, or better, argument could have been made is not a sufficient basis for finding deficient performance]), or that defendant was prejudiced. The trial court's ruling demonstrates it had an appropriate command of the facts.

### 2.    *Defendant's Youth*

Defendant also complains that even though defense counsel cited cases discussing the impact of youth on the mental state required for murder, counsel did not directly raise this issue in the briefing or at oral argument. However, even if counsel should have raised the issue of defendant's youth, defendant has not shown prejudice. As we discussed *ante*, the court expressly considered defendant's youth and found it did not mitigate his mens rea. Defendant has failed to show it is reasonably probable he would have obtained a better result had counsel separately raised the issue.

### 3.    *Inadequate Grasp of* Sanchez

Defendant further argues that his counsel's performance was deficient because he demonstrated an inadequate grasp of how *Sanchez, supra*, 63 Cal.4th 665,[12] was relevant to the gang expert's testimony. But even if we assume counsel's performance was deficient, defendant has failed to show how he was prejudiced. Defendant has not shown that any portion of the gang expert's testimony was inadmissible under *Sanchez* because it was based on case-specific hearsay. Nor has he shown that the trial court relied on any inadmissible case-specific hearsay in its ruling.

### 4.    *Failure to Keep Abreast of Law*

Defendant additionally faults his former counsel because:  (1) counsel was not aware that *People v. Gonzalez* (2023) 87 Cal.App.5th 869, 880-881, held that a first

---

[12]    *Sanchez* held that an expert may not relate as true case-specific hearsay as the basis for his or her opinion unless the facts are independently proven by competent evidence or covered by a hearsay exception. (*Sanchez, supra*, 63 Cal.4th at pp. 684-686.)

degree murder conviction cannot be reduced to second degree murder under section 1172.6; (2) counsel advocated for the application of CALCRIM No. 401 even though courts had found that instruction ill-suited for the crime of aiding and abetting an implied malice murder (*People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1265; *People v. Powell, supra*, 63 Cal.App.5th at p. 714); and (3) counsel filed " 'notices' " of "recent" court of appeal decisions that were published before briefing, instead of discussing the cases in the briefs. Again, even if we assume this was deficient performance, defendant has not demonstrated any prejudice and we find none. The trial court was made aware of *Gonzalez* and did not reduce the conviction to second degree murder. The court understood the elements of aiding and abetting an implied malice murder. And the court is presumed to have considered the additional authority cited in counsel's notices. (*People v. Stowell, supra*, 31 Cal.4th at p. 1114 [trial court is presumed to have been aware of and followed the applicable law].)

### 5. *Notice of Appeal*

Finally, defendant complains that defense counsel was deficient for incorrectly stating in the notice of appeal that the jury had found defendant "to be the one who did the stabbing." But this misstatement occurred after the trial court denied the resentencing petition and clearly could not have prejudiced defendant.

### 6. *Cumulative Effect*

Defendant contends that even if defense counsel's errors were not individually prejudicial, they were cumulatively so. We disagree. Although we have found or assumed several errors, we find them to be both individually and cumulatively harmless. We see no reasonable probability that a result more favorable to the defendant would have been reached in the absence of these errors. (*People v. Kocontes* (2022) 86 Cal.App.5th 787, 891.)

DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.


           \s\_____,
                Krause, J.


We concur:


  \s\_____,
Robie, Acting P. J.


  \s\_____,
Feinberg, J.

21